449 F.3d 16
 NARRAGANSETT INDIAN TRIBE, Plaintiff, Appellant,
v.
State of RHODE ISLAND and Providence Plantations et al., Defendants, Appellees.
 No. 04-1155.
 United States Court of Appeals, First Circuit.
 Heard December 6, 2005.
 Decided May 24, 2006.
 
 Douglas J. Luckerman, with whom John F. Killoy, Jr. and David Kaplan were on brief, for appellant.
 Jill Elise Grant, Daniel I.S.J. Rey-Bear, Rodina C. Cave, and Nordhaus Law Firm, LLP on brief for National Congress of American Indians, American Civil Liberties Union, and American Civil Liberties Union, Rhode Island Affiliate, amici curiae.
 Claire J. Richards, Special Counsel, for appellee Governor Donald L. Carcieri.
 Neil F.X. Kelly, Assistant Attorney General, with whom Patrick C. Lynch, Attorney General, was on brief, for remaining state appellees.
 Joseph S. Larisa, Jr., Assistant Solicitor, for municipal appellees.
 Before BOUDIN, Chief Judge, TORRUELLA, SELYA, LYNCH, LIPEZ and HOWARD, Circuit Judges.
 OPINION EN BANC
 SELYA, Circuit Judge.
 
 
 1
 This case pits the Narragansett Indian Tribe (the Tribe) against the State of Rhode Island (the State).[1] It requires us to answer a challenging question of first impression: May officers of the State, acting pursuant to an otherwise valid search warrant, enter upon tribal lands and seize contraband (in this case, unstamped, untaxed cigarettes) owned by the Tribe and held by it for sale to the general public?
 
 
 2
 The district court answered this question affirmatively. See Narragansett Indian Tribe v. Rhode Island, 296 F.Supp.2d 153, 170 (D.R.I.2003). A panel of this court disagreed in part, holding that the Tribe's sovereign immunity insulated it from the State's criminal process. See Narragansett Indian Tribe v. Rhode Island, No. 04-1155, slip op. at 36, 2005 WL 1119758 (1st Cir. May 12, 2005). The en banc court withdrew Parts II(D)(3) and (4) of that opinion, id. at 29-36, and ordered rehearing en banc limited to the questions of whether, to what extent, and in what manner Rhode Island may enforce its civil and criminal laws with respect to the particular activities of the Tribe here at issue.
 
 
 3
 After careful review, we hold that, given the language and intent of the Rhode Island Indian Claims Settlement Act (the Settlement Act), 25 U.S.C. §§ 1701-1716, state officers were authorized to execute the warrant against the Tribe and to arrest tribal members incident to the enforcement of the State's civil and criminal laws. We therefore affirm the judgment of the district court.
 
 I. BACKGROUND
 
 4
 We begin with a synopsis of the unique relationship between the Tribe and the State and then turn to the particulars of the current dispute. For these purposes, we assume the reader's familiarity with the history of the dispute as described in the opinions of the district court and the panel.
 
 A. The Relationship Between the Tribe and the State.
 
 5
 The Narragansett Indians, aboriginal inhabitants of what is now Rhode Island, enjoyed cordial relations with the early English settlers on Roger Williams's Providence Plantations. This peaceful coexistence ended in 1675, when the Tribe was drawn into King Philip's War against Puritan colonists. The war decimated the Tribe, and its surviving members settled in the vicinity of what is now Charlestown, Rhode Island. In 1880, after nearly a century of resistance to the State's assimilation efforts, the Tribe agreed to surrender its tribal authority and to sell all but two acres of its lands for the sum of $5,000. Almost immediately, the Tribe regretted the sale. In an effort to recoup the lands, it launched a protracted legal and political battle. See generally Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n, 158 F.3d 1335, 1336 (D.C.Cir. 1998).
 
 
 6
 This endeavor reached a fever pitch in 1975, when the Tribe filed a pair of complaints in the United States District Court for the District of Rhode Island. In these complaints, the Tribe alleged that it possessed approximately 3,200 acres of land as part of its aboriginal territory; that the 1880 conveyance of that land mass was void under the Indian Nonintercourse Act, 25 U.S.C. § 177, because the State failed to secure federal approval; and that, inasmuch as its aboriginal title had never been extinguished, the Tribe held a claim of title superior to that of any landowner whose chain of title depended upon the 1880 sale. See id. at 1336-37.
 
 
 7
 The pending litigation clouded the titles of hundreds of Rhode Island landowners. To dissipate this cloud, the State, the town of Charlestown, and the affected landowners, as parties of the first part, and the Tribe, as party of the second part, executed a joint memorandum of understanding (the J-Mem) on February 28, 1978. The J-Mem created a carefully calibrated relationship between the Tribe and the State centering on 1,800 acres of land in and around Charlestown (the settlement lands). The J-Mem provided that the settlement lands would be formed out of two parcels, one donated by the State and the other purchased from private landowners with funds furnished by the federal government. The Tribe gained effective control of the settlement lands in exchange for the relinquishment of its claims, the voluntary dismissal of its lawsuits, and its agreement that, with the exception of state hunting and fishing regulations, "all laws of the State of Rhode Island shall be in full force and effect on the settlement lands." In addition to donating half the settlement lands, the State agreed to create an Indian-controlled corporation to hold the settlement lands in trust for the Tribe, to exempt the settlement lands from local taxation, and to work toward securing passage of the federal legislation necessary to implement the agreement. See generally Narragansett Indian Tribe v. Rhode Island, 296 F.Supp.2d at 161.
 
 
 8
 Both the Rhode Island General Assembly and Congress subsequently passed the necessary enabling legislation. See R.I. Gen. Laws §§ 37-18-1 to 37-18-15; 25 U.S.C. §§ 1701-1716. Dovetailing with the counterpart provision of the J-Mem, the federal piece of this legislative mosaic—the Settlement Act—declared that "the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708(a).[2]
 
 
 9
 The conveyances to the holding company followed apace. The Secretary of the Interior thereafter granted the Tribe official federal recognition. See 48 Fed.Reg. 6,177-6,178 (Feb. 2, 1983). On the heels of this recognition, the settlement lands changed hands twice more. In 1985, the Rhode Island General Assembly amended the pertinent state statute to permit the conveyance of the settlement lands directly to the Tribe; the amendments included a provision that preserved the State's jurisdiction over the settlement lands in terms substantially identical to those memorialized in section 1708(a). See R.I. Gen. Laws 37-18-13(b). The holding company later made the authorized conveyance.
 
 
 10
 Three years thereafter, the Tribe deeded the settlement lands to the Bureau of Indian Affairs (the BIA) as trustee. The trust deed explicitly confirmed the applicability of state law on the settlement lands as provided by section 1708(a). The BIA continues to hold the settlement lands in trust for the Tribe. See Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 689, 695 & n. 8 (1st Cir.1994).
 
 
 11
 During the next quarter-century, the relationship between the Tribe and the State was fraught with tension. See, e.g., id. at 690-91 (chronicling a long-running dispute anent the Tribe's desire to conduct gambling operations on the settlement lands). Having failed in its persistent efforts to launch a gaming facility, the Tribe eventually turned to tobacco as a potential source of revenue. This case represents the culmination of that endeavor.
 
 B. The Controversy at Hand.
 
 12
 Rhode Island law establishes a complex scheme for the taxation of cigarettes. See R.I. Gen. Laws §§ 44-20-1 to 44-20-55. Under that scheme, the State imposes an excise tax on all cigarettes sold, distributed, or held for sale or distribution within its borders. Id. §§ 44-20-12, 44-20-13. The excise tax is collected through the sale of cigarette stamps, which must be affixed to every package of cigarettes brought into the State. Id. §§ 44-20-13, 44-20-18, 44-20-29. A dealer has twenty-four hours after coming into possession of unstamped cigarettes within which to affix the stamps. Id. § 44-20-29. The sale or purchase of unstamped cigarettes is a misdemeanor. Id. §§ 44-20-33, 44-20-35, 44-20-36. Unstamped cigarettes are contraband and, as such, are subject to seizure by the State. Id. § 44-20-37.
 
 
 13
 On July 12, 2003, the Tribe, acting pursuant to a tribal ordinance, opened a smoke shop on the settlement lands. The smoke shop offered an array of cigarettes for sale to the general public (i.e., members of the Tribe and nonmembers alike). The Tribe's avowed purpose in establishing the smoke shop was to generate funds for its social programs.
 
 
 14
 Believing that the State lacked the legal authority to compel its compliance with the cigarette tax scheme, the Tribe refused to purchase cigarette stamps. It also refused to precollect the State's sales tax, see id. § 44-18-19, from those who purchased the Tribe's cigarettes. By dint of these refusals, the Tribe was able to sell unstamped, untaxed cigarettes at prices substantially below market.
 
 
 15
 On July 14, 2003, Rhode Island State Police entered the settlement lands and raided the smoke shop. Their intent was to seize contraband cigarettes pursuant to a search warrant issued by a state court of competent jurisdiction. Despite the warrant, the troopers' entry sparked an altercation with members of the Tribe. When the smoke cleared, the troopers had arrested eight individuals, including the Tribe's Chief Sachem, and had confiscated the Tribe's entire inventory of unstamped, untaxed cigarettes.
 
 
 16
 In the aftermath of this acrimonious episode, the Tribe filed suit in the federal district court, seeking a declaratory judgment that its sovereign status as a federally recognized Indian tribe precluded the State from applying its cigarette tax scheme to the Tribe's sale of cigarettes on the settlement lands. Relatedly, the Tribe sought a declaration that sovereign immunity insulated it from the State's criminal process and shielded from arrest those tribal members who had participated in the operation of the smoke shop. After submitting the case on stipulated facts, the parties cross-moved for summary judgment.
 
 
 17
 The district court granted brevis disposition in the State's favor, grounding its decision on two crucial determinations. First, the court concluded that the legal incidence of the cigarette tax fell on the purchaser rather than the seller and that, therefore, the Tribe had to comply with the tax scheme when selling cigarettes on the settlement lands. 296 F.Supp.2d at 167. Second, the court concluded that section 1708(a) of the Settlement Act authorized state officers to enter the settlement lands, seize the Tribe's stock of unstamped, untaxed cigarettes, and arrest tribal members working in the smoke shop. Id. at 170, 177.
 
 
 18
 The Tribe appealed. A panel of this court affirmed in part and reversed in part. The panel accepted the district court's determination that the Tribe must comply with the State's cigarette tax scheme when selling cigarettes on the settlement lands.[3] Op. at 24-25. The panel disagreed, however, with the lower court's ruling that the State could enforce the cigarette tax scheme through the execution of a search warrant against the Tribe. Id. at 33. Although section 1708(a) preserved the State's criminal jurisdiction over the settlement lands, the panel reasoned, it did not grant the State criminal jurisdiction over the Tribe and, accordingly, the Tribe's sovereign immunity prevented the State from executing a search warrant against the Tribe. Id. at 33.
 
 
 19
 On the State's petition, see Fed. R.App. P. 35(b), we vacated the portions of the panel opinion relating to the State's enforcement powers and granted rehearing en banc on the narrow questions of "whether, to what extent, and in what manner Rhode Island may enforce its civil and criminal laws with respect to the operation of the [s]moke [s]hop by the Narragansett Indian Tribe" and "the effect (if any) of tribal sovereign immunity" on the State's enforcement authority. Narragansett Indian Tribe v. Rhode Island, 415 F.3d 134 (1st Cir.2005) (unpublished order). We turn now to those questions.
 
 II. ANALYSIS
 
 20
 It is beyond peradventure that a state may seize contraband cigarettes located outside Indian lands but in transit to a tribal smoke shop. See Washington v. Confed. Tribes of Colville Indian Reserv., 447 U.S. 134, 161-62, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). Withal, the question of whether a state, as a general matter, may enter Indian lands and seize unstamped cigarettes owned by an Indian tribe is open. See id. at 162, 100 S.Ct. 2069. We need not answer that vexing question in the abstract; here, the plain language and purport of the J-Mem and the Settlement Act supply the answer with respect to activities on the settlement lands.
 
 
 21
 We bifurcate our analysis, first addressing whether the State may execute a search warrant on the settlement lands and then mulling whether tribal sovereign immunity can be said to prevent the State from executing such a warrant against the Tribe and from arresting tribal members involved in the smoke shop enterprise.[4]
 
 A. The Ability to Execute a Search Warrant.
 
 22
 The State asseverates that the J-Mem and the Settlement Act, when read in light of the unique historical context in which they arose, permitted state officers to execute a search warrant on the settlement lands as part of the due enforcement of the State's cigarette tax scheme. We think that proposition is correct.
 
 
 23
 The Tribe agreed in the J-Mem (with certain modest exceptions not relevant here) that "all laws of the State of Rhode Island shall be in full force and effect on the settlement lands." That agreement did not materialize out of thin air; it followed intense negotiations and led to the Tribe's receipt of over 1,800 acres of land. Congress confirmed this negotiated arrangement in the Settlement Act, mandating (again with explicit but modest exceptions) that "the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708(a). As the unqualified language of both the J-Mem and the Settlement Act makes pellucid, the authority ceded to the State and assented to by the Tribe was broad in its terms. The negotiated arrangement and the confirmatory statute effectively extinguished the Tribe's right to resist the application of state authority as to matters occurring on the settlement lands. And that arrangement drew no distinction between tribal members and the Tribe itself, on the one hand, and the general public, on the other hand.
 
 
 24
 In effect, then, the Tribe abandoned any right to an autonomous enclave, submitting itself to state law as a quid pro quo for obtaining the land that it cherished. It is surpassingly difficult to imagine what the linguistic formulation that embodied this concession would entail if not an acknowledgment that the State may enforce its applicable criminal laws on the settlement lands by conventional means; any contrary interpretation would make the relevant provisions of both the J-Mem and the Settlement Act meaningless. The execution of a search warrant referable to violations of the State's legally binding cigarette tax scheme falls squarely within the ambit of the ceded authority. Indeed, the carefully calibrated agreement between the Tribe and the State—an agreement from which, by virtue of the creation and conveyance of the settlement lands, the Tribe greatly benefitted—would be altered dramatically if the State were without power to enforce its binding laws through conventional means such as the execution of a search warrant on the settlement lands.
 
 
 25
 The J-Mem, the Settlement Act, and their historical antecedents make this case strikingly different from the mine-run of cases that have struggled to reconcile the sovereignty of Indian tribes with the legitimate interests of host states. Thus, we rest our decision squarely on these idiosyncratic features. We note, however— contrary to the view of our dissenting brethren—that the general body of Indian law also supports a conclusion that the State may undertake the enforcement activities at issue in this case.
 
 
 26
 The Supreme Court has held that because Congress has plenary power over Indian matters, see Morton v. Mancari, 417 U.S. 535, 551-52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the assertion of state suzerainty within tribal lands is permissible where it has not been preempted by the operation of federal law. New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 333, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983). The application of federal preemption doctrine in Indian matters has special characteristics; it "calls for a particularized inquiry into the nature of the state, federal, and tribal interests at stake." Id. (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 145, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)). Courts must conduct this inquiry in the albedo of traditional notions of Indian sovereignty, including the settled federal policy of promoting Indian self-governance and the overarching goal of encouraging tribal self-sufficiency and economic development. Id. at 334-35, 103 S.Ct. 2378.
 
 
 27
 Employing this paradigm requires us to identify and weigh the competing state, federal, and tribal interests that obtain within the concrete factual context of this dispute. In conducting this tamisage, we are cognizant that Congress has not granted the Tribe any special powers with respect to the specific subject matter involved here (cigarette sales). This is important because, in the absence of special legislation, the balance of state, federal, and tribal interests in regard to cigarette taxation leaves considerable room for state intervention on tribal lands. See Dep't of Tax. & Fin. v. Milhelm Attea & Bros., 512 U.S. 61, 73, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994). Here, special legislation of a different sort—the Settlement Act—figures in the balance, and, as we have explained, that legislation increases the room for state intervention.
 
 
 28
 Keeping in mind that both the Tribe and its members are subject to a legal obligation to comply with the State's cigarette tax scheme, see supra note 3, it is readily evident that the State's interest in maintaining the integrity of that scheme contrasts favorably with the Tribe's interest in operating the smoke shop as a tax haven. Appropriate enforcement measures are needed to check wholesale transgressions of the State's scheme by price-conscious purchasers willing to flout their legal obligations. See Moe v. Confed. Salish and Kootenai Tribes, 425 U.S. 463, 482, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). Enforcement is also necessary to prevent the Tribe "from marketing [its] tax exemption to nonmembers who do not receive significant tribal services and who would otherwise purchase their cigarettes" outside the settlement lands. Colville, 447 U.S. at 157, 100 S.Ct. 2069.
 
 
 29
 The Tribe's countervailing interest is not impressive. Although the Tribe has a legitimate stake in generating revenue for its social programs free from unwarranted state interference, that interest is significantly weaker where, as here, it seeks to purvey goods made by outsiders—goods as to which the Tribe has only a fleeting commercial connection. See Mescalero Apache Tribe, 462 U.S. at 341, 103 S.Ct. 2378; see also Colville, 447 U.S. at 156-57, 100 S.Ct. 2069. Moreover, the fact that the Tribe and its members are legally required to comply with the State's cigarette tax scheme makes it very difficult for the Tribe to identify any legitimate reason for resisting state enforcement of the scheme. In this case, then, the scales tip in favor of recognizing the State's authority to execute a search warrant on the settlement lands.
 
 
 30
 Endeavoring to blunt the force of this reasoning, the Tribe importunes us to resurrect a line of cases that at one time insulated tribal action on tribal lands from state interference independent of federal preemption. See, e.g., Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) (pronouncing that Indian tribes' inherent sovereign right to "make their own laws and be ruled by them" constitutes a bar to state action on tribal lands). We reject these importunings. While the approach of treating inherent tribal sovereignty as an independent impediment to state action on tribal lands has never been abandoned by the Supreme Court in haec verba, the Justices have come to treat this doctrine as no more than a piece of the background against which preemption analysis must be conducted. See, e.g., Nevada v. Hicks, 533 U.S. 353, 362-64, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) (indicating that state officers may execute, on reservation lands, a search warrant referable to a tribal member's off-reservation violation of state law); see also Colville, 447 U.S. at 156, 100 S.Ct. 2069; McClanahan v. Ariz. State Tax Comm'n, 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).
 
 
 31
 To sum up, the J-Mem and the Settlement Act, seen in their historical setting, compel a conclusion that the State retains the authority to issue and enforce a search warrant relative to the sale of unstamped, untaxed cigarettes on the settlement lands. General principles of Indian law reinforce that conclusion.
 
 B. The Effect of Tribal Sovereign Immunity.
 
 32
 To this point, we have determined that the State may enforce its cigarette tax scheme by executing an otherwise valid search warrant on the settlement lands. The remaining question is whether tribal sovereign immunity prohibits the State from executing such a warrant against the Tribe or from arresting tribal members participating in the operation of the smoke shop pursuant to a tribal ordinance. We believe that the resolution of this binary question is clearly adumbrated by our earlier discussion of the purpose and effect of the J-Mem and the Settlement Act.
 
 
 33
 At the threshold, we pause to confront a point made by our dissenting brethren. They suggest that our approach to this question disregards the "subtle but important" distinction between tribal sovereignty and tribal sovereign immunity announced in a decision of a panel of this court. Post at 32 (Lipez, J., with whom Torruella, J., joins, dissenting) (quoting Aroostook Band of Micmacs v. Ryan, 404 F.3d 48, 68 (1st Cir.2005)). This criticism rests on shaky ground. The Aroostook panel—with scant citation to authority— saw a distinction that is not apparent to us; it framed the distinction as being that the doctrine of tribal sovereignty contemplates that, in certain circumstances, a tribe "is not subject to state laws ... at all," whereas tribal sovereign immunity "means that [a tribe] is not amenable to state judicial or quasi-judicial proceedings to enforce those laws." Aroostook, 404 F.3d at 68 (emphasis in original). In our view, both the Aroostook panel's sculpting of the distinction and its ensuing discussion of the scope of tribal sovereign immunity misread the applicable Supreme Court precedents and, thus, are incorrect. As we already have explained, "the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption," McClanahan, 411 U.S. at 172, 93 S.Ct. 1257; see Hicks, 533 U.S. at 362, 121 S.Ct. 2304, treating sovereignty instead as the source of "tribal power ... to protect tribal self-government or to control internal relations" through tribal regulation of activities on tribal lands, Montana v. United States, 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); see Hicks, 533 U.S. at 358-60, 121 S.Ct. 2304. Consistent with this trend, tribal sovereign immunity is most accurately considered an incidence or subset of tribal sovereignty. See, e.g., Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (indicating that tribal sovereign immunity is an incidence of tribal sovereignty). Consequently, we expressly overrule Aroostook with respect to the distinction in question and proceed with our bifurcated inquiry.
 
 
 34
 1. Confiscation of Cigarettes. The Tribe asserts that its sovereign status as a federally recognized Indian tribe immunizes it from state court process, including search warrants related to the enforcement of the State's cigarette tax scheme. On this rationale, the State, even if it may enter the settlement lands and execute a search warrant against an individual, may not execute such a warrant against the Tribe or its property. As indicated above, see supra Part II(A), the State's most potent retort is that the combined force of the J-Mem (by waiver) and section 1708(a) (by abrogation) defeats the Tribe's claim of sovereign immunity. We find this retort dispositive.
 
 
 35
 An Indian tribe's sovereign immunity may be limited by either tribal conduct (i.e., waiver or consent) or congressional enactment (i.e., abrogation). Kiowa Tribe v. Mfg. Techs., Inc., 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998); Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 29 (1st Cir.2000). While such actions must be clear and unequivocal in their import, see C & L Enters. v. Citizen Band Potawatomi Indian Tribe, 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001), there is no requirement that talismanic phrases be employed. Thus, an effective limitation on tribal sovereign immunity need not use magic words. See id. at 420-21, 121 S.Ct. 1589.
 
 
 36
 At the expense of repastinating ground already well-ploughed, we explain why we find both waiver and abrogation here. In the J-Mem, the Tribe, for valuable consideration received—1,800 acres of coveted land—explicitly acknowledged that, with certain modest exceptions not applicable here, "all laws of the State of Rhode Island shall be in full force and effect on the settlement lands." (Emphasis supplied). This concession was an integral part of the bare-knuckled negotiations that created the settlement lands. Read in light of this unique historical context, the provision quoted above clearly and unambiguously establishes that the parties to the J-Mem intended to subjugate the Tribe's autonomy on and over the settlement lands (and, thus, its sovereign immunity) to the due enforcement of the State's civil and criminal laws. Any other interpretation of the J-Mem would defy common sense and, in the bargain, nullify the State's most important quid pro quo. Hence, there was a waiver.
 
 
 37
 The record also evinces an abrogation of the Tribe's sovereign immunity with respect to activities on the settlement lands. Unlike most other federal statutes touching on the complicated relationship between tribes and states, the Settlement Act codified an agreement based on "the mutual consent of all parties." H.R.Rep. No. 95-1453, at 11 (1978), reprinted in 1978 U.S.C.C.A.N. 1948, 1954. In order to effectuate the parties' shared intent, the Settlement Act, consistent with the J-Mem, guaranteed that the settlement lands would be "subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708(a) (emphasis supplied); see Narragansett Indian Tribe, 19 F.3d at 695 & n. 8 (noting that, at all pertinent times, the Tribe and the State took pains to reaffirm section 1708(a)'s vitality).
 
 
 38
 We must read statutes, whenever possible, to give effect to every word and phrase. United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir.1985). Moreover, we must presume that Congress acts with knowledge of relevant Supreme Court precedent. See Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988). At the time Congress passed the Settlement Act, the Supreme Court already had adopted the approach of permitting the exercise of state jurisdiction within Indian lands where the exercise of such jurisdiction had not been preempted by federal law. See McClanahan, 411 U.S. at 172, 93 S.Ct. 1257; Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); Organized Vill. of Kake v. Egan, 369 U.S. 60, 74-75, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). Thus, section 1708(a) would be mere surplusage if, as the Tribe contends, it contemplates no more than that the State may exercise jurisdiction within the settlement lands subject to the constraints of tribal sovereign immunity. In other words, if the reference to "jurisdiction" in section 1708(a) is to have any meaning, it must effectuate some limitation on the Tribe's sovereign immunity. Combining this language with the historical background, we conclude that section 1708(a) largely abrogates the Tribe's sovereign immunity.[5]
 
 
 39
 We say "largely" in an abundance of caution. We recognize that the Tribe may continue to possess some degree of autonomy "in matters of local governance," including "matters such as membership rules, inheritance rules, and the regulation of domestic relations." Narragansett Indian Tribe, 19 F.3d at 701. But that core group of sovereign functions, whatever its dimensions, is not implicated in this case. Here, the State is seeking to enforce laws binding on the Tribe's commercial transactions with outsiders, not to dictate, say, tribal membership or inheritance rules. Whatever the exact contours of the Tribe's retained sovereignty, those contours are narrow-and it is perfectly clear that trafficking in contraband cigarettes is not within them. Cf. Felix S. Cohen, Handbook of Federal Indian Law 122 (1988 ed.) (noting that "Indian self-government ... includes the power of an Indian tribe to adopt and operate under a form of government of the Indians' choosing, to define conditions of tribal membership, to regulate domestic relations of members, to prescribe rules of inheritance, to levy taxes" and the like).
 
 
 40
 This result is consistent with two important principles. First, the Settlement Act, properly read, ensures that the State may demand the Tribe's compliance with state laws of general application. Second, it also ensures that the State may use its entire armamentarium of legal means for redressing noncompliance. The "full force" of the State's preserved criminal jurisdiction logically encompasses the enforcement of criminal laws that are binding on the Tribe's commercial transactions with outsiders. That, in turn, encompasses the authority to execute a search warrant against the Tribe for its violations of those laws on the settlement lands. We conclude, therefore, that, under the terms of the J-Mem and the Settlement Act, the Tribe is not immune from the execution of a search warrant secured as part of the State's effort to enforce the Tribe's obligation to comply with a legally applicable cigarette tax scheme.
 
 
 41
 Judge Torruella, in his separate dissent, calumnizes this construction of the Settlement Act, arguing that it is inconsistent with the canon of construction teaching that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). In Judge Torruella's view, section 1708(a) is such a provision. See post at 39 (Torruella, J., dissenting). But that argument rests on a flawed premise. Section 1708(a), when read in light of the J-Mem and the unique historical context surrounding its enactment, clearly abrogates the Tribe's sovereign immunity with respect to the State's enforcement activities on the settlement lands. And because there is no ambiguity in the meaning and purport of section 1708(a), this case does not implicate the hoary canon of construction relied on by the dissent.
 
 
 42
 The dissenters attack our reading of the "full force and effect" language on a different front as well. They assert that the Supreme Court "has held that such language . . . does not waive or abrogate tribal sovereign immunity." Post at 33-34 (Lipez, J., with whom Torruella, J., joins, dissenting). In support of this proposition, they rely on the Supreme Court's refusal to construe language in a different federal statute (commonly referred to as Public Law 280) as an abrogation of tribal sovereign immunity. See Three Affiliated Tribes of Fort Berthold Reserv. v. Wold Eng'g, 476 U.S. 877, 892, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986). This reliance is mislaid: the historical context and purpose of Public Law 280 are so completely different from those of the Settlement Act that, despite some linguistic coincidences, the Court's interpretation of that law has no bearing on the issues before us. We explain briefly.
 
 
 43
 Public Law 280 authorizes the courts of five enumerated states to assert jurisdiction over certain criminal and civil actions that may arise on designated Indian lands. See Pub.L. No. 83-280, §§ 2, 4, 67 Stat. 588, 588-90 (1953), codified as amended at 18 U.S.C. § 1162 and 28 U.S.C. § 1360. The law also prescribes a procedure by which any other state can extend its adjudicatory jurisdiction to actions arising in Indian country. See 25 U.S.C. §§ 1321-1322. The criminal jurisdiction component of Public Law 280 allows a state to assume "jurisdiction over offenses committed by or against Indians in ... Indian country ... to the same extent that such State ... has jurisdiction over offenses committed elsewhere within the State" and mandates that "the criminal laws of such State ... shall have the same force and effect within such Indian country as they have elsewhere within the State." 18 U.S.C. § 1162(a) (emphasis supplied). The civil jurisdiction component of Public Law 280 allows state courts to assume jurisdiction over "civil causes of action between Indians or to which Indians are parties which arise in ... Indian country" and directs that "those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere in the State." 28 U.S.C. § 1360(a) (emphasis supplied).
 
 
 44
 Prior to the enactment of Public Law 280, the Supreme Court had held that states had no jurisdiction to prosecute crimes committed on a reservation so long as either the perpetrator or the victim was an Indian. See Williams v. United States, 327 U.S. 711, 714 & n. 10, 66 S.Ct. 778, 90 L.Ed. 962 (1946). In a similar vein, state courts historically have had no jurisdiction over civil suits against tribal members when the cause of action arose out of on-reservation activities. See, e.g., Lee, 358 U.S. at 222, 79 S.Ct. 269. For the most part, then, both types of cases were within the exclusive jurisdiction of tribal courts. See Bryan v. Itasca County, 426 U.S. 373, 379-83, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). But many tribal court systems failed to provide effective public and private justice to reservation Indians.
 
 
 45
 In an effort to ameliorate this situation, Congress enacted Public Law 280. See id. (explaining that Congress enacted the statute to correct this failure and to redress "the problem of lawlessness on certain Indian reservations" and "the lack of adequate Indian forums for resolving private legal disputes" involving reservation Indians). Accordingly, the predominant purposes of Public Law 280 were to provide reservation Indians with access to state courts and to authorize the application of state law to disputes arising in Indian country. Id. This background clearly differentiates Public Law 280's extension of state jurisdiction over Indian lands from that contemplated by the Settlement Act. Public Law 280 neither reflected the "mutual consent of all parties," H.R.Rep. No. 95-1453, at 11 (1978), reprinted in 1978 U.S.C.C.A.N. 1948, 1954, nor resulted from a negotiated arrangement in which a tribe surrendered certain sovereign rights in exchange for substantial concessions from the host state.[6]
 
 
 46
 If more were needed—and we doubt that it is—Public Law 280 was primarily intended to facilitate the extension of state adjudicatory jurisdiction over Indian country. See Bryan, 426 U.S. at 379-83, 96 S.Ct. 2102. By contrast, the purpose of the Settlement Act was to extend "all sorts of jurisdiction," including state regulatory jurisdiction, over the settlement lands. Narragansett Indian Tribe, 19 F.3d at 695. Given the stark contrast between the purposes of these two statutes, comparing Public Law 280 and the Settlement Act is like comparing plums and pomegranates. It follows inexorably that the Supreme Court's determination that Public Law 280's "force and effect" language did not abrogate tribal sovereign immunity from civil suit is uninstructive of the meaning of the "full force and effect" phrase in the context of the carefully calibrated agreement between the Tribe and the State.[7]
 
 
 47
 The Tribe takes a somewhat different path, averring that our conclusion that the J-Mem and the Settlement Act largely cancel out the Tribe's sovereign immunity is inconsistent with general principles of Indian law which, according to the Tribe, routinely vindicate claims of tribal sovereign immunity from state court process. We perceive no such inconsistency.
 
 
 48
 Most of the cases cited by the Tribe stand for the entirely unremarkable proposition that an Indian tribe is generally immune from civil suits brought by state governments or private individuals. See, e.g., Kiowa Tribe, 523 U.S. at 754, 118 S.Ct. 1700; Fletcher v. United States, 116 F.3d 1315, 1324 (10th Cir.1997); Tamiami Partners v. Miccosukee Tribe of Indians, 63 F.3d 1030, 1048 (11th Cir.1995) (Tamiami II); Imperial Granite Co. v. Pala Band of Mission Indians, 940 F.2d 1269, 1271 (9th Cir.1991); see also TTEA v. Ysleta Del Sur Pueblo, 181 F.3d 676, 680-81 (5th Cir.1999) (holding that an Indian tribe enjoys sovereign immunity from an award of money damages only, not with respect to declaratory or injunctive remedies). However, these cases also recognize that tribal sovereign immunity may be circumscribed by waiver or abrogation. See, e.g., Kiowa Tribe, 523 U.S. at 754, 118 S.Ct. 1700; Fletcher, 116 F.3d at 1324; Tamiami II, 63 F.3d at 1038 n. 30. None of these cases arise under a statute configured in the fashion of the Settlement Act; nor do any of them address a state's power to enforce its admittedly applicable criminal laws against a noncompliant Indian tribe. Consequently, they offer no insight into the question of whether the State may execute a search warrant against the Tribe on the settlement lands as part of its enforcement of the Tribe's obligation to comply with binding state law.
 
 
 49
 The decision in Maynard v. Narragansett Indian Tribe, 984 F.2d 14 (1st Cir. 1993), does not require a different result. That case involved a civil suit against the Tribe for an alleged trespass on private property outside the settlement lands. Id. at 15. In upholding the district court's dismissal of the complaint against the Tribe, a panel of this court indicated that neither the J-Mem nor the Settlement Act vitiated the Tribe's sovereign immunity. Id. at 15-16. The facts of the Maynard case dictate that any holding there was necessarily limited to civil suits premised on activities occurring outside the settlement lands. That holding may or may not be correct—the case at hand does not require us to say—but to the extent that Maynard contains dictum that is susceptible to a broader reading, see, e.g., id. at 16, that dictum is flatly incorrect, and we disavow it.[8]
 
 
 50
 In a last-ditch effort to salvage its case, the Tribe proffers a Ninth Circuit case holding that tribal sovereign immunity prohibits a state from executing a search warrant against an Indian tribe. Bishop Paiute Tribe v. County of Inyo, 291 F.3d 549, 560 (9th Cir.2002). The Tribe fails to mention that the Supreme Court subsequently vacated that decision, albeit on other grounds. See Inyo County v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony, 538 U.S. 701, 712, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003). At any rate, the decision is easily distinguished. It neither addressed a state's power to enforce its applicable criminal laws against a noncompliant Indian tribe nor involved a statute that had the teeth that Congress implanted in the Settlement Act. Consequently, the decision offers no guidance with respect to the unique relationship between the Tribe and the State in regard to activities occurring on the settlement lands.[9]
 
 
 51
 2. Arrests. The stipulated facts do not specify the basis for the arrests of tribal members during the raid. We accept for purposes of this appeal the Tribe's contention that the persons in question were arrested because of their participation in a tribally owned enterprise (the smoke shop). Building on this contention, the Tribe maintains that its sovereign immunity shielded those individuals from arrest. The premise of this argument—that the Tribe itself enjoys immunity from the enforcement activities at issue in this case— is incorrect. See supra Part II(B)(1). Accordingly, there is no derivative immunity available to the Tribe's members.
 
 
 52
 We add, moreover, that even if the Tribe was entitled to the protection of sovereign immunity in this case—which it is not— that protection would not cover the tribal members involved in the operation of the smoke shop. The general rule is that tribal sovereign immunity does not protect individual members of an Indian tribe. See Puyallup Tribe, Inc. v. Dep't of Game, 433 U.S. 165, 171-72, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). At its most expansive, tribal sovereign immunity may extend to tribal officers—but only when such officers are acting within the legitimate scope of their official capacity. See Tamiami Partners v. Miccosukee Tribe of Indians, 177 F.3d 1212, 1225 & n. 16 (11th Cir.1999) (Tamiami III) (collecting cases); but cf. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 59, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (holding that "[a]s an officer of the [Indian tribe], petitioner ... is not protected by the tribe's immunity from suit").
 
 
 53
 Whatever the scope of a tribal officer's official capacity, it does not encompass activities that range beyond the authority that a tribe may bestow. See Tamiami III, 177 F.3d at 1225; Tamiami II, 63 F.3d at 1045, 1050-51. It follows from this tenet that because the Tribe is legally obligated to comply with the State's cigarette tax scheme, see supra note 3, violations of that scheme by the Tribe's officers fall outside the scope of their official capacity. Therefore, the arrests of the Tribe's officers involved in the smoke shop operation would be valid regardless of the scope of the Tribe's sovereign immunity.
 
 III. CONCLUSION
 
 54
 In the final analysis, the J-Mem and the Settlement Act dictate the result we reach. Under their terms, the Tribe surrendered any right to operate the settlement lands as an autonomous enclave. It is plainly not the case, as the Tribe would have it, that an Indian tribe can render any conceivable act on Indian lands (say, drug trafficking) impervious to state regulation by the simple expedient of labeling it "tribal." That is emphatically true with respect to the Tribe's activities on the settlement lands.
 
 
 55
 In sum, the Tribe remains as free as ever to operate the smoke shop; it simply must comply with state law in the process. That result is not disquieting: after all, no principle of federal law or tribal self-governance authorizes Indian tribes "to market an exemption from state taxation to persons who would normally do their business elsewhere." Colville, 447 U.S. at 155, 100 S.Ct. 2069. The Tribe has not explained how being subject to the enforcement of the State's cigarette tax scheme is an infringement on its retained sovereignty when being subject to the requirements of the scheme is not.
 
 
 56
 Consistent with the foregoing, we hold, first, that the J-Mem and the Settlement Act authorized state officers to enter the settlement lands and execute a search warrant as part of the enforcement of the State's cigarette tax scheme. Second, in light of the unique historical and legal context in which this case arises — and, particularly, the provisions of the J-Mem and the Settlement Act — we conclude that the Tribe's sovereign immunity neither prohibited the State from executing that warrant against the Tribe nor barred it from arresting tribal officers and members for activities incident to the operation of the smoke shop. Consequently, the State's actions here — its entry into the settlement lands, its seizure of the Tribe's inventory of unstamped, untaxed cigarettes, and the accompanying arrests — were lawful.
 
 
 57
 In arriving at these conclusions, we do not diminish the dignity and respect that should be afforded the Tribe as a sovereign entity. Nor do we imply that dragnet arrests and police raids on the settlement lands should be the State's preferred method for enforcing the Tribe's obligation to comply with state law. We recognize, however, that the Tribe and the State negotiated a carefully calibrated agreement between sovereigns, memorialized that agreement in the J-Mem, and sealed the deal by obtaining Congress's imprimatur. It is not for the courts to rewrite the terms of that arrangement.
 
 
 58
 
 The district court's order granting the appellees' motion for summary judgment and denying the appellant's motion for summary judgment is affirmed.
 
 
 
 59
 LIPEZ, Circuit Judge (with whom TORRUELLA, Circuit Judge, joins), dissenting.
 
 
 60
 In an apparent attempt to limit the scope of its holding, the majority claims to rest its decision "squarely on [the] idiosyncratic features" of the Narragansett Tribe's relationship with the State of Rhode Island. Then, in an effort that belies this narrow approach, the majority engages in a lengthy analysis of "the general body of Indian law" to support its idiosyncratic holding. Along the way, it repudiates two of our precedents to varying degrees. Respectfully, neither the majority's characterization of this case as idiosyncratic nor its analysis of the general body of Indian law can withstand scrutiny. The Narragansett Tribe's relationship with the State of Rhode Island reflects a familiar history. The majority's application of tribal sovereign immunity in this case is incompatible with Supreme Court precedents. For these reasons, I join Judge Torruella in dissenting. I write separately to elaborate on my disagreement with the majority's analysis.
 
 A. A Common Fact Pattern
 
 61
 This is not an "idiosyncratic" case based on a "unique relationship." The history of litigation and legislation outlined in the majority opinion is prototypical of that involving several tribes, especially in the East but also in parts of the West. The Narragansetts, like many of these tribes, brought suit in the 1970s to contend that their ancestral lands had been alienated in violation of the Indian Non-Intercourse Act. 1 Stat 137 (1790) (codified as amended at 25 U.S.C. § 177 (2000)). See, e.g., Oneida County v. Oneida Indian Nation of New York, 470 U.S. 226, 229-30, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (recounting litigation in New York); Miccosukee Tribe Of Indians of Florida v. Florida, No. 79-253-CIV-JWK (S.D.Fla.) (1979); Mohegan Tribe of Indians v. Connecticut, C.A. No. H-77-434 (D.Conn.) (1977). Rhode Island, like several other states, decided to agree to certain of the Tribe's demands, rather than to tolerate the depressed property values that had resulted from the Indians' claims. See, e.g., 25 U.S.C. § 1772 (detailing "agreement" between Florida and Seminole Tribe, intended to resolve clouded land titles); 25 U.S.C. § 1771 (same re: Massachusetts and Wampanoag Tribe); 25 U.S.C. § 1774 (same re: New York and Seneca Nation). And, as it did in resolving other disputes between states and tribes, Congress enacted legislation to seal the deal. See generally 25 U.S.C. §§ 1701, 1721, 1741, 1751, 1771, 1772, 1773, 1774, 1775 (discussing Congressional role in resolving disputes in Rhode Island, Maine, Florida, Connecticut, Massachusetts, Washington State, and New York). What the majority says about sovereign immunity in this case has implications for the application of sovereign immunity in these similar contexts. The majority's treatment of tribal sovereign immunity will not be limited to the facts of this case.
 
 B. Sovereignty and Sovereign Immunity
 
 62
 The concept of tribal sovereign immunity derives, of course, from the more general concept of tribal sovereignty. See Blatchford v. Native Village of Noatak, 501 U.S. 775, 782, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) (explaining that Indian tribes are sovereign entities, subject to the control of the federal government but not the states); United States v. James, 980 F.2d 1314, 1319 (9th Cir.1992) ("Tribal immunity is just that: sovereign immunity that attaches to a tribe because of its status as a dependant domestic nation."). But the two doctrines are not interchangeable. In a recent decision, we described the distinction between sovereignty and sovereign immunity as "subtle but important." Aroostook Band of Micmacs v. Ryan, 404 F.3d 48, 68 (1st Cir.2005). We noted that when a tribe asserts its sovereignty, it is claiming, "in essence, that it is not subject to state laws . . . at all." Id. On the other hand, we said, "tribal sovereign immunity means that [a tribe] is not amenable to state judicial or quasi-judicial proceedings to enforce those laws," even if the tribe is bound to observe them. Id.
 
 
 63
 The majority now overrules Aroostook "with respect to the distinction in question." However, there are several Supreme Court cases in which a tribe has been held immune from suit even though it was subject to state law. Indeed, the case the majority cites for its rejection of the distinction in Aroostook, Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 512-13, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), distinguished between tribal sovereignty and tribal sovereign immunity exactly as the panel did in Aroostook. In Oklahoma Tax Comm'n, the Supreme Court concluded that an Indian tribe in Oklahoma lacked any sovereign authority to sell tax-free cigarettes on its lands. Even so, the Court reasoned, the tribe's sovereign immunity remained intact, and Oklahoma could not sue the tribe to collect wrongfully withheld taxes. More recently, in Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751, 754-55, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), the Court emphasized the same distinction. That case also involved a situation in which an Indian tribe had flouted state contract law but could not be sued in state court for a remedy. "There is a difference," the Court observed in Kiowa Tribe, "between the right to demand compliance with state laws and the means available to enforce them." Id. at 755, 118 S.Ct. 1700. This "difference" is the precise distinction noted by the panel in Aroostook, and it is exactly the difficulty that the majority overlooks in this case. The State's actions here cannot be approved solely by virtue of the State's substantive authority to demand the Tribe's compliance with the cigarette tax laws. Oklahoma Tax Comm'n could not have been clearer on that point.
 
 
 64
 I accept that the Tribe never had any authority to "market an exemption from state taxation to persons who would normally do their business elsewhere," and so was bound to assist the State in its collection of cigarette taxes. Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 155, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). I acknowledge, as I explain below, that in agreeing to the language later embodied in section 1708(a), the Tribe could no longer shield its own members from state prosecution for offenses committed on tribal lands. I will even assume, without deciding, that the majority is correct that the Tribe's sovereign autonomy is now limited largely to "matters of local governance." Maj. Op. at 26 (quoting Rhode Island v. Narragansett Indian Tribe 19 F.3d at 701). None of this changes the fact that the Tribe's sovereign immunity still extends, unless specifically limited, to "governmental or commercial activities . . . on or off a reservation." Kiowa Tribe, 523 U.S. at 760, 118 S.Ct. 1700. A tribe's sovereign authority and its sovereign immunity simply are not coterminous.
 
 
 65
 The majority also questions whether tribal sovereign immunity serves as a defense to the execution of a search warrant. At its core, tribal sovereign immunity protects a tribe from a lawsuit. See Kiowa Tribe of Oklahoma, 523 U.S. at 754, 118 S.Ct. 1700 (holding that tribe's sovereign immunity prevented lawsuit to collect on promissory note). But sovereign immunity also provides a defense to the efforts of states to enforce their criminal law against tribes. See Puyallup Tribe v. Department of Game, 433 U.S. 165, 171, 172-73, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) (allowing enforcement "analogous" to criminal prosecution against individual tribal members, but barring the state from using the same measures against a tribe itself); see also James, 980 F.2d at 1319-20 (recognizing that tribal sovereign immunity required quashing a criminal subpoena directed to Indian tribe). Since a tribe's sovereign immunity protects it from a state's civil suit to recover cigarette taxes, see Oklahoma Tax Comm'n, 498 U.S. at 513, 111 S.Ct. 905, and also provides protection in situations "analogous" to criminal prosecutions, tribal sovereign immunity is implicated when a state uses its criminal process to seize, from the Tribe itself, cigarettes that do not have tax stamps.
 
 
 66
 C. Waiver and Abrogation of Tribal Sovereign Immunity
 
 
 67
 1. "Force and Effect"
 
 
 68
 In addressing whether the Tribe's sovereign immunity is intact, which it does despite disavowing the importance of the question, the majority focuses on language in the JMOU stating that the laws of Rhode Island would apply in "full force and effect," and a similar statement in the Settlement Act providing that "the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." There is no other provision about jurisdiction in either document. I find the majority's analysis of this language unconvincing. Congress has used this language for half a century to confer state jurisdiction over individual Indians on tribal lands. Both before and since the JMOU and Settlement Act, the Supreme Court consistently has held that such language — however categorically stated — does not waive or abrogate tribal sovereign immunity.
 
 
 69
 As best as I can tell, the language of the JMOU and Settlement Act originated in 1953's Public Law 280, where Congress provided for state "jurisdiction" to exist "to the same extent" and for the state laws to have "the same force and effect" on affected Indian lands as on non-Indian lands.[10] Two years before Congress adopted the Settlement Act, the Supreme Court expressly rejected the contention that this conferral of "jurisdiction" by the "force and effect" provision had abrogated or waived tribal sovereign immunity. In Bryan v. Itasca County, 426 U.S. 373, 389, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the Court stated in plain language that "there is notably absent [in Public Law 280] any conferral of state jurisdiction over the tribes themselves." The next year, the Supreme Court reiterated that the categorical grant of jurisdiction in Public Law 280 did not contain any abrogation of tribal sovereign immunity. See Puyallup Tribe, 433 U.S. at 172-73, 97 S.Ct. 2616. Nine years later, in Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, 476 U.S. 877, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986), the Court repeated the conclusion in Itasca County and rejected a suggestion that Public Law 280 could provide an escape from tribal sovereign immunity. "We have never read Pub.L. 280," the Court said, "to constitute a waiver of tribal sovereign immunity." Id. at 892, 106 S.Ct. 2305. See also California ex rel California Dep't of Fish and Game v. Quechan Tribe of Indians, 595 F.2d 1153, 1156 (9th Cir.1979) (explaining why Pub.L. 280's extension of state jurisdiction over tribal lands did not subject the tribe to suit by the state to enforce state criminal laws).
 
 
 70
 As the majority says, "we must presume that Congress acts with knowledge of relevant Supreme Court precedent." If we are to apply this maxim to an interpretation of section 1708(a), the most relevant precedents are Itasca County, which was decided just two years before Congress adopted § 1708(a), and Puyallup Tribe, enacted just one year before. If Congress had wanted to abrogate the Tribe's sovereign immunity in 1978, it would not have done so by repeating language that the Supreme Court had held in each of the previous two years did not result in "any conferral of state jurisdiction over the tribes themselves." Itasca County, 426 U.S. at 389, 96 S.Ct. 2102. This is especially so because, when it acted, Congress knew very well that the statute it produced would be "liberally construed, doubtful expressions being resolved in favor of the Indians." Id. at 392, 96 S.Ct. 2102 (internal quotation marks omitted).
 
 
 71
 Nor do I understand how the "force and effect" language constituted a waiver of the Tribe's sovereign immunity when it appeared in the Tribe's JMOU with the State. The Tribe could not have understood that it was waiving its sovereign immunity to suit by the State by agreeing that its lands — like the lands of so many other tribes — would be under the criminal authority of the State. Instead, the Tribe bargained for a relationship with State law enforcement that would mirror the relationship in dozens of places around the country, where the "force and effect" of a state's criminal jurisdiction did not impair tribal sovereign immunity. In short, in preparing the JMOU and the Settlement Act, Congress, the State, and the Tribe all understood that the language they had chosen could not abrogate a tribe's sovereign immunity.[11] Surely, if a waiver of tribal sovereign immunity really was "the State's most important quid pro quo" — as the majority insists, without citation to any historical document — the State would have demanded different language.[12]
 
 
 72
 Accepting the majority's contention that the Settlement Act contains a broader conferral of substantive jurisdiction than Public Law 280 does not change anything. I do not suggest that the Settlement Act and Public Law 280 serve identical purposes. I aver only that the parties to the JMOU and Settlement Act borrowed language from Public Law 280 at a time, and in a manner, that does not evince any intent to subject the Tribe itself to the criminal processes of the State. No matter how broadly the majority construes section 1708(a)'s jurisdictional language, the majority cannot point to anything in that section, in the broader Act, in the JMOU, or in the history underlying those documents, that even suggests any agreement that the Tribe itself could be made a party to state court process involuntarily.[13]
 
 
 73
 There is another reason to doubt the majority's reading of the Settlement Act and JMOU, and another reason we can be sure that this is not an "idiosyncratic case." The phrases that the majority uses to find an abrogation and waiver of the Tribe's sovereign immunity have become widely-used terms of art, well known to extend jurisdiction over individuals on tribal lands without affecting the sovereign immunity of tribes themselves. Identical or similar phrasing has been commonly part of agreements between states and tribes, and the Congressional legislation that validates them. Many of the Eastern tribes that have regained their sovereign rights through the combination of negotiated agreement and statutory provision that I sketched above possess their lands subject to language remarkably similar to language that the majority analyzes here. See, e.g., 25 U.S.C § 1775d ("The criminal laws of [Connecticut] shall have the same force within [the Mohegan tribe's] reservation and Indian country as such laws have elsewhere in the State."). Other tribes around the country hold their lands subject to 25 U.S.C. §§ 1321 and 1322 — the modern-day version of Public Law 280, enacted in 1968 — which allow states and tribes to agree that certain tribal lands will fall under state jurisdiction. Again, the wording is nearly identical to that at issue here. See 25 U.S.C. § 1321 (providing that, upon agreement, the state's "jurisdiction [will apply] to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State," and that the "the criminal laws of [the State] shall have the same force and effect within such Indian country or part thereof as they have elsewhere within the State"); 25 U.S.C. 1322 (similar in civil context). Given this array of laws, I see no way to limit the majority's abrogation of the Tribe's sovereign immunity, so that it does not also call into question the sovereign immunity claimed, by the many tribes that hold lands brought under state jurisdiction by the several settlement acts or 25 U.S.C. §§ 1321-22.[14]
 
 2. The Maynard case
 
 74
 We already have held that the Settlement Act and JMOU did not constitute an abrogation or waiver of the Tribe's sovereign immunity. Maynard v. Narragansett Indian Tribe, 984 F.2d 14 (1st Cir.1993). In Maynard, we correctly stated that any "waiver or abrogation" of tribal sovereign immunity would have to be "infer[red]" from the settlement documents. Id. at 16. But such waivers cannot be inferred. Congressional abrogation of tribal sovereign immunity must be "unequivocal[ ]" to be effective, and a tribe's waiver of its immunity from state court process must be "clear." C & L Enterprises, 532 U.S. at 418, 121 S.Ct. 1589 (internal quotation marks omitted).
 
 
 75
 As an en banc court, we have the authority to discard precedents. But I disagree with any suggestion that today's holding can be squared with Maynard. The majority says that Maynard is inapposite here because this is not a "civil suit premised on activities occurring outside the settlement lands." As I have explained above, however, the same sovereign immunity that protects a tribe from civil lawsuits also protects it from criminal process. If anything, there is a stronger rationale for recognizing the Tribe's sovereign immunity here than in Maynard because, while Maynard involved an injunctive suit to stop the Tribe's purported interference with a private landowner's activities on his own lands, this case involves the State's effort to execute its process on tribal lands. See Kiowa Tribe, 523 U.S. at 763-64, 118 S.Ct. 1700 (Stevens, J., dissenting) (noting that tribal sovereign immunity has a stronger basis when applied to quash actions relating to activities on tribal lands). In short, Maynard cannot be distinguished to reach the result of the majority opinion. It must be overruled. Regrettably, the majority has done just that. Maynard's analysis of the Tribe's sovereign immunity was correct.
 
 D. Surplusage
 
 76
 The majority is simply wrong that "section 1708(a) would be mere surplusage if, as the Tribe contends, it contemplates no more than that the State may exercise jurisdiction within the settlement lands subject to the constraints of tribal sovereign immunity." The majority says that "[a]t the time Congress passed the Settlement Act, the Supreme Court already had adopted the approach of permitting the exercise of state jurisdiction within Indian lands where the exercise of such jurisdiction had not been preempted by federal law." This statement reflects a basic misunderstanding of Indian law.
 
 
 77
 At the time Congress adopted the Settlement Act, as now, a state not expressly granted jurisdiction over Indian lands by Congress, pursuant to Public Law 280, 25 U.S.C. §§ 1321-22, 18 U.S.C. § 1162, or another similar statute, lacked criminal or civil jurisdiction over individual Indians who committed crimes on those lands. See, e.g., Ross v. Neff, 905 F.2d 1349 (10th Cir.1990) (recognizing that in the absence of an express Congressional grant of jurisdiction, a state law enforcement officer has no authority to arrest an individual Indian for a criminal offense committed on Indian land); United States v. Daye, 696 F.2d 1305, 1307 (11th Cir.1983) (same). See also Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) ("[S]tate courts have been allowed to try non-Indians who committed crimes against each other on a reservation. . . . But if the crime was by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress has remained exclusive.").
 
 
 78
 That is also the state of the law now. No Supreme Court case authorizes a state to extend its criminal court processes by preemption to conduct committed by individual Indians on Indian lands. The majority's reliance on McClanahan v. State Tax Comm'n of Arizona, 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), for the proposition that Rhode Island needed neither Congressional authorization nor the Tribe's approval to exercise such jurisdiction over the Tribe's lands, is misguided. The McClanahan Court expressly rejected an approach that would allow states to exercise jurisdiction over Indians on tribal lands on their own initiative. Rather, the Court said, Congress has made it clear that states cannot exert jurisdiction over Indians on Indian lands — not to mention Indian tribes — "unilaterally." Id. at 178, 93 S.Ct. 1257. Indeed, McClanahan routinely is cited for precisely the opposite of the majority's proposition. The case stands for the nearly irrebuttable presumption that a state cannot extend its jurisdiction to activities conducted by individual Indians, on their tribal lands, without an express grant of authority by Congress. See Oklahoma Tax Comm'n v. Sac & Fox Nation, 508 U.S. 114, 125-26, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993).
 
 
 79
 If there had been no section 1708(a) or similar express conferral of criminal jurisdiction, the State would not have been able to prosecute a crime committed by an Indian on the Settlement Lands. Any such crime would have been prosecuted in tribal or federal court. See 18 U.S.C. §§ 1152-56. That is the way things are done, to this day, on many Western reservations over which no state ever has been granted jurisdiction. See, e.g., State v. Eagle Speaker, 300 Mont. 115, 4 P.3d 1 (2000) (recognizing that indictment for theft must be dismissed because the state lacked jurisdiction to prosecute an individual Indian who had committed a crime within a reservation).[15] Congress knew when it promulgated section 1708(a) that states lack criminal jurisdiction over individual Indians in Indian country absent an express conferral of jurisdiction by Congress. Section 1708(a), which undoes this baseline rule, is not mere "surplusage" if it does not abrogate the Tribe's sovereign immunity.
 
 E. Ex parte Young
 
 80
 As Judge Torruella indicates, the State had options for enforcing its cigarette tax laws that would have been compatible with the Tribe's sovereign immunity. For example, the State could have sought an injunction, pursuant to Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), against the tribe's Chief Sachem and any other relevant official, for violating the federal law giving Rhode Island the ability to tax cigarette sales on the settlement lands.
 
 
 81
 In Oklahoma Tax Comm'n, a case involving cigarette tax enforcement, the Supreme Court explicitly left open the Ex parte Young door. 498 U.S. at 514, 111 S.Ct. 905. In Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), the Court allowed a suit to enjoin enforcement of a purportedly illegal tribal ordinance to proceed against a tribal official, even though tribal sovereign immunity barred the same suit against the tribe itself. See id. at 59, 98 S.Ct. 1670. See also Puyallup Tribe, 433 U.S. at 173, 97 S.Ct. 2616. The extension of the Ex parte Young doctrine to tribal officials is well established in the courts of appeals as well. The Ninth Circuit has endorsed the idea categorically. See Dawavendewa v. Salt River Project Agr. Imp. & Power Dist., 276 F.3d 1150, 1159-60 (9th Cir.2002) (recognizing that "suits against [tribal] officials allegedly acting in contravention of federal law" are "permitted"). The Eighth Circuit has recognized that state Ex parte Young suits against tribal officials are available with "mutuality" to the same extent as tribal Ex parte Young suits against state officials. See Fond du Lac Band of Chippewa Indians v. Carlson, 68 F.3d 253, 256-57 (8th Cir.1995). The Eleventh Circuit has held similarly. See Tamiami Partners v. Miccosukee Tribe of Florida, 63 F.3d 1030, 1050-51 (11th Cir.1995).
 
 
 82
 Here, nothing barred the State from taking the Ex parte Young route. The search warrant was issued on the first day the tribal smoke shop opened. The search happened two days later. The officer who swore out the search warrant admitted that he had known for weeks about the Tribe's plans to sell tax-free cigarettes. An action for injunctive relief could have addressed the State's concerns (this was not a case where the State was seeking to recoup a large sum in uncollected taxes). Further, an Ex parte Young action would have placed this matter in federal court at the outset, where it could have been decided in peaceful fashion, according to the federal law principles that govern Indian law. Instead, the State encroached upon the Tribe's sovereign immunity with its unwise and unlawful resort to criminal process and seizure of tribal property.
 
 
 83
 F. Conclusion.
 
 
 84
 In Kiowa Tribe, the Supreme Court confronted a situation similar to this one. Frustrated by its inability to enforce in court a valid contract it had negotiated with an Indian tribe, a corporation asked the Court to limit tribal sovereign immunity because it was incompatible with substantive obligations to which the tribe had agreed. The Court acknowledged that the tribal sovereign immunity doctrine might be incompatible in some instances with modern tribal business endeavors. See Kiowa Tribe, 523 U.S. at 757-58, 118 S.Ct. 1700. Still, the Court refused to overrule its precedents on tribal sovereign immunity, and it rejected any suggestion that tribal sovereign immunity should only apply in matters relating to a tribe's "core group of sovereign functions." Maj. Op. at 26. Noting that "Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests" involved in any new limitations on tribal sovereign immunity, the Court warned that "the capacity of the Legislative branch to address the issue by comprehensive legislation counsels some caution by us in this area." Kiowa Tribe, 523 U.S. at 759, 118 S.Ct. 1700.
 
 
 85
 The majority ignores this warning and takes the opposite course. Casting aside our own precedents, it construes tribal sovereign immunity not as the Supreme Court has explained it, nor as the Tribe and State must have understood it, but in a constrained fashion that the majority believes makes sense in this case. This is a misguided effort. As the Supreme Court has repeatedly articulated the doctrine, the law of tribal sovereign immunity shielded the Tribe from the State's criminal process.
 
 
 86
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 The named defendants include various Rhode Island state officials, the Town of Charlestown, and the Charlestown Police Department. Because the central dispute is between the Tribe and the State, we address it in those terms
 
 
 [2]
 The statutory scheme does exempt the settlement lands from state hunting and fishing regulations,see 25 U.S.C. § 1706(a)(3), but that exemption is of no consequence here.
 
 
 [3]
 In granting rehearing en banc, we chose not to revisit this point. That choice left intact the panel's holding that the Tribe must comply with the cigarette tax scheme when it sells cigarettes on the settlement lands. That holding has, therefore, become the law of the caseSee United States v. Moran, 393 F.3d 1, 7 (1st Cir.2004) (stating that "a legal decision made at one stage of a ... civil proceeding should remain the law of that case throughout the litigation, unless and until the decision is modified or overruled by a higher court").
 
 
 [4]
 In his separate dissent, Judge Torruella argues that this second question is not properly before the en banc court under the law of the case doctrineSee post at 41 n. 18 (Torruella, J., dissenting). This argument mischaracterizes the unrevoked portion of the panel opinion, which concludes only that the Settlement Act did not effectuate a "wholesale abrogation of the Tribe's sovereign immunity." Op. at 27 (emphasis supplied). This statement leaves ample room for us to examine the dimensions of the Tribe's sovereign immunity vis-à-vis the settlement lands. In all events, the order granting rehearing en banc, quoted supra, indisputably opened the sovereign immunity question to our consideration.
 
 
 [5]
 The Tribe notes that the Maine Indian Claims Settlement Act, which was passed some years after the statute at issue here, includes a more explicit abrogation of tribal sovereign immunitySee 25 U.S.C. § 1725(d). From this, the Tribe argues that Congress's failure to be similarly explicit in section 1708(a) heralds an intent not to cancel out the Tribe's sovereign immunity. In our view, the particulars of the Maine Act have little bearing here. Cf. Akins v. Penobscot Nation, 130 F.3d 482, 484 & n. 2 (1st Cir.1997) (remarking the uniqueness of the "structure of analysis" under the Maine Act and distinguishing it from the Rhode Island Settlement Act). That is particularly so given the idiosyncratic circumstances surrounding the execution of the J-Mem and the subsequent enactment of section 1708(a).
 
 
 [6]
 In fact, Public Law 280 originally authorized states to assume civil and criminal adjudicatory jurisdiction over Indian country without first securing tribal consent. Pub.L. No. 83-280, § 7, 67 Stat. 588, 590 (1953). Congress subsequently amended the law to require such consent as a precondition to the extension of state jurisdiction over tribal landsSee 25 U.S.C. §§ 1321-1322; see also Bryan, 426 U.S. at 386, 96 S.Ct. 2102.
 
 
 [7]
 The Supreme Court cases cited by the dissenters in support of the "force and effect" argument involve Public Law 280's civil jurisdiction provision and operate against the general rule of tribal sovereign immunity from civil suitSee Three Affiliated Tribes, 476 U.S. at 890-91, 106 S.Ct. 2305; Puyallup Tribe, Inc. v. Dep't of Game, 433 U.S. 165, 170-73, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977); Bryan, 426 U.S. at 389, 96 S.Ct. 2102. To our knowledge, the Supreme Court has not addressed whether sovereign immunity ordinarily insulates an Indian tribe from state criminal process or whether Public Law 280's criminal jurisdiction provision places any limitation on tribal sovereign immunity.
 
 
 [8]
 The Tribe's reliance on the unpublished opinion inNarragansett Tribe v. Guilbert, 989 F.2d 484 (1st Cir.1993) (table), is equally misplaced. That case, like Maynard, involved the Tribe's immunity from a civil suit (in the form of a counterclaim for money damages) for activities occurring outside the settlement lands. In all events, the opinion has no precedential force. See 1st Cir. R. 32.3.
 
 
 [9]
 The Tribe's citation toUnited States v. James, 980 F.2d 1314, 1319 (9th Cir.1992), in which the Ninth Circuit ruled that tribal sovereign immunity bars a federal court from issuing a subpoena duces tecum against a non-party tribe, suffers from the same infirmities.
 
 
 [10]
 Public Law 280 gave state courts criminal jurisdiction over all Indian country in California and Nebraska, and most Indian country in Minnesota, Oregon, and Wisconsin, and allowed states to assert jurisdiction over many other Indian lands without tribal consent. The criminal jurisdiction provision in the law provides that relevant states
 shall have jurisdiction over offenses committed by or against Indians in the [relevant] areas of Indian country . . . to the same extent that such State has jurisdiction over offenses committed elsewhere within the state, and the criminal laws of such State shall have the same force and effect within such Indian country as they have elsewhere within the State
 Public Law 83-280, 67 Stat. 588 (1953).
 
 
 [11]
 The majority claims that, because this case is "idiosyncratic," we can ignore the Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1725(a) & (d), which was adopted in 1980 and contains explicit abrogations of tribal sovereign immunity. In the Maine act, Congress made clear that certain "Indian nations, or tribes or bands of Indians" would be "subject to the civil and criminal jurisdiction of the State." 25 U.S.C. § 1725(a). Congress also explicitly provided for all Maine tribes to "sue and be sued . . . to that same extent as any other entity or person residing in the State of Maine." 25 U.S.C. § 1725(d). Contrary to what the majority suggests, that statute — which speaks precisely to the question of tribal sovereign immunity — adds considerable doubt to any assertion that Congress intended to abrogate Narragansett tribal immunity in the nearly contemporaneous but very differently-worded Settlement Act
 
 
 [12]
 In reality, the Congressional findings of fact that accompanied the Settlement Act indicate that the State's most important "quid pro quo" was the Tribe's agreement not to institute any further land claims suits, so that "clouds on titles" would be removed, and the "severe economic hardships" born by non-Indians who held lands near the contested area would endSee 25 U.S.C. §§ 1701(b), (c).
 
 
 [13]
 The majority places substantial reliance on the Supreme Court's statement inC & L Enterprises v. Citizen Band Potawatomi Indian Tribe, 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001), that "talismanic" phrases are not required to effectuate a tribal waiver of sovereign immunity. The cases applying C & L have recognized that a waiver of sovereign immunity requires some reference to the tribe itself (rather than to its lands or members). See, e.g., Building Inspector and Zoning Officer of Aquinnah v. Wampanoag Aquinnah Shellfish Hatchery Corp., 443 Mass. 1, 818 N.E.2d 1040, 1048-49 (2004) (holding that even though specialized phrasing was not employed, tribe clearly waived its sovereign immunity from zoning enforcement by agreeing to hold the relevant lands "in the same manner . . . as any other Massachusetts corporation"). The problem here is not a choice of language, but the lack of any language in any of the relevant documents that speaks to jurisdiction over the Tribe.
 
 
 [14]
 The majority places great emphasis on the fact that the State's jurisdiction over the Tribe's lands was "based on `the mutual consent of all parties,'" Maj. Op. at 28 (quoting H.R.Rep. No. 95-1143, at 11). But this fact does not distinguish this case from the run of the mill. The mutual consent of all the involved parties underlies each of these post-1968 conferrals of jurisdiction over Indian lands
 
 
 [15]
 Nevada v. Hicks, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), does not change this principle in the least. Hicks merely clarified that a tribal court did not have jurisdiction over an Indian's tort claim against non-Indian defendants. The conduct subject to the tort claim in Hicks, moreover, was a state's prosecution of an individual Indian for off-reservation conduct. See id. at 358-59, 121 S.Ct. 2304; Id. at 375, 121 S.Ct. 2304 (Souter, J., concurring).
 
 
 
 87
 TORRUELLA, Circuit Judge (Dissenting).
 
 
 88
 Although I join Judge Lipez's cogent dissent, I write separately to add a few additional points of my own.
 
 
 89
 I dissent from the majority's holding because I believe that the majority ignores Supreme Court precedent — some of which is 150 years old, see, e.g., In re Kansas Indians, 5 Wall. 737, 72 U.S. 737, 760, 18 L.Ed. 667 (1866) — in two significant ways. First, it brushes aside the Supreme Court's consistent guidance that a waiver or abrogation of sovereign immunity must be unequivocal and explicit. See, e.g., Santa Clara Pueblo v. Martínez, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (noting that "[i]t is settled that a waiver of sovereign immunity cannot be implied but must be unequivocally expressed") (internal quotation marks and citations omitted). Second, even assuming arguendo that there was some ambiguity about whether there has been a waiver or abrogation of sovereign immunity in this case, the majority fails to take into account the so-called Indian canon of construction — i.e., that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). This is most unfortunate; for the majority chooses to disregard a long-standing policy rule of obvious necessity and importance in the trust relationship between the United States and Indian nations. See Choate v. Trapp, 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941 (1912) (noting that in the construction of a statute dealing with Indians, "doubtful expressions . . . are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years . . ." (emphasis added)). See also Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918); Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930); Choctaw Nation of Indians v. United States, 318 U.S. 423, 432, 63 S.Ct. 672, 87 L.Ed. 877 (1943); McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 174, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 656 n. 7, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1973).
 
 
 90
 With reference to the application and enforcement of state laws to Indian tribes, the Supreme Court has held in a number of instances that "[t]here is a difference between the right to demand compliance with state laws and the means available to enforce them." Kiowa Tribe of Okla. v. Manufacturing Techs., Inc., 523 U.S. 751, 755, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998); Okla. Tax Comm'n v. Citizen Band of Potawatomi Tribe of Okla., 498 U.S. 505, 513-14, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). The matter before this Court involves the enforcement by a state of its law against an Indian tribe qua tribe.
 
 
 91
 Although this case directly concerns only the Narragansett Indian Tribe (the "Narragansetts" or "the Tribe"), whose ancestral lands[16] are located in what is today part of the State of Rhode Island ("Rhode Island" or "the State"), this Court has before it a neuralgic issue of import that extends beyond this specific appeal. If the views adopted by the majority regarding the power of Rhode Island to enforce its laws directly against the Tribe qua tribe ultimately prevail, the concept of tribal sovereignty developed by the Supreme Court, Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (Indian tribes retain all sovereignty not specifically withdrawn by Congress), will be radically altered, and Native American tribal governments throughout the United States[17] may very well become irrelevant facades. See Bryan v. Itasca County, 426 U.S. 373, 388, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (Congress did not intend, when extending civil and criminal jurisdiction of states to Indian reservations to undermine or destroy such tribal governments as did exist, or to convert the affected tribes into little more than private, voluntary organizations).
 
 
 92
 The record of this case establishes that on July 14, 2003, members of the Rhode Island State Police entered Narragansett tribal land to execute a search warrant issued by a Rhode Island state court, authorizing the search of a smoke shop located on tribal lands and owned by the Tribe. The police officers found quantities of cigarettes in the smoke shop which did not have the appropriate tax stamps affixed as required by state law, R.I. Gen. Laws § 44-20-33, and proceeded to confiscate them as contraband, id. § 44-20-37, after overcoming the physical resistance of various tribal officers and members who considered the actions of the State's officers a violation of the Tribe's sovereignty.
 
 
 93
 Rhode Island alleges that its actions constituted a valid exercise of its substantive and jurisdictional powers pursuant to § 1708(a) of the Rhode Island Indian Claims Settlement Act, 25 U.S.C. §§ 1701 et seq. ("Settlement Act"), and Paragraph 13 of the "Joint Memorandum of Understanding Concerning the Settlement of the Rhode Island Settlement Lands" ("JMOU").
 
 
 94
 Paragraph 13 of the JMOU, which predates the Settlement Act and was entered into in 1978, states that
 
 
 95
 except as otherwise specified in this memorandum, all Laws of the State of Rhode Island shall be in full force and effect on the Settlement Lands.
 
 Section 1708(a) reads as follows:
 
 96
 Except as otherwise provided in this Act, the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island.
 
 
 97
 The State points to the language of the JMOU for support of its contention that the Tribe has waived its tribal sovereignty and immunity. It also argues that in any event, the language of the Settlement Act demonstrates unequivocally that Congress has abrogated tribal sovereign immunity. During oral argument, the State further expanded its position, claiming that by virtue of these provisions the Narragansetts relinquished all claims to tribal sovereignty and immunity and retained no semblance or residue of sovereignty or immunity that could be validly interposed by the Tribe qua Indian tribe against the actions of Rhode Island.
 
 
 98
 The majority seizes upon this argument by the State to rule upon an issue that, according to the law of this case, is not before us.[18] I choose to overlook this error by the majority because the merits of the issue ultimately make the point irrelevant. It is nevertheless symptomatic of the manner in which the majority runs roughshod over Supreme Court and First Circuit precedent to reach its desired outcome.
 
 
 99
 It is essential to understand that but for a valid waiver or abrogation of tribal sovereignty, the State's enforcement actions against the Tribe qua tribe were illegal. Consequently, the key issue in this case is determining whether there has been any such waiver or abrogation.
 
 
 100
 It is clear that when tested against long-standing principles of Indian law, the sweeping asseverations made by the State regarding waiver and abrogation are lacking in substance. Tribal sovereignty, and concomitantly, tribal sovereign immunity, may not be stripped from an Indian tribe by statutory silence or by inference extracted from ambiguous language:
 
 
 101
 Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers . . . [Although] [t]his aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress[,] . . . without congressional authorization, the Indian Nations are exempt from suit. It is settled that a waiver of sovereign immunity cannot be implied but must be unequivocally expressed.
 
 
 102
 Santa Clara Pueblo, 436 U.S. at 58, 98 S.Ct. 1670 (emphasis supplied) (internal quotation marks and citations omitted). See also Kiowa, 523 U.S. at 754, 118 S.Ct. 1700 ("As a matter of federal law a tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity."); Montana, 450 U.S. at 544, 101 S.Ct. 1245 (Indian tribes retain all sovereignty not specifically withdrawn by Congress).
 
 
 103
 It is "[w]ith these considerations of `Indian sovereignty . . . [as] a backdrop against which the applicable . . . federal statut[e] must be read'". Santa Clara Pueblo, 436 U.S. at 60, 98 S.Ct. 1670 (citing McClanahan, 411 U.S. at 172, 93 S.Ct. 1257). I have searched exhaustively for any language unequivocally expressing the waiver or abrogation of tribal sovereignty (or the included tribal sovereign immunity) in either the JMOU or § 1708(a), but alas no such provision is to be found. In fact, neither the term "tribal sovereignty" nor "tribal sovereign immunity" are even mentioned in either stipulation. Such tombstone silence can hardly be considered an "unequivocal expression" indicating that either a waiver or an abrogation has taken place.
 
 
 104
 Although the lack of such specificity makes any search of the legislative history unnecessary and irrelevant, In re Rivera Torres, 432 F.3d 20, 32 (1st Cir.2005) (Torruella, J., concurring), in an abundance of caution I have also looked for any language indicative of Congressional abrogation of these tribal rights in the scant legislative history of the Settlement Act that is available. Again, I have come up empty-handed. The House Report that accompanied the Settlement Act is silent on the subject of either tribal sovereignty or tribal sovereign immunity, much less of language specifically abrogating those rights. See H.R. Rep. 95-1453, 1978 U.S.C.C.A.N. 1948.
 
 
 105
 What § 1708 means is that the State's laws and jurisdiction apply within the tribal lands to individuals, both Indians and non-Indians, and also that those laws can be enforced against those individuals. Nevada v. Hicks, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). Were § 1708(a) not in place, Rhode Island law could not be applied within tribal lands at all. See Title III, 25 U.S.C. §§ 1321-1326; McClanahan, 411 U.S. at 170-71, 93 S.Ct. 1257. However, the application and enforcement of state law against individuals within tribal lands by virtue of § 1708, and actions by the state which involve the enforcement of those laws directly against the Tribe qua tribe are totally different concepts. Kiowa, 523 U.S. at 755, 118 S.Ct. 1700. Thus, as an example, because of the doctrine of tribal sovereign immunity, a state cannot without specific Congressional approval sue an Indian tribe to collect unpaid taxes notwithstanding that those state laws may be applicable to individuals within tribal lands. Potawatomi, 498 U.S. at 510, 111 S.Ct. 905 (recognizing tribal immunity from suit to collect unpaid cigarette taxes). Nor, absent Congressional abrogation or waiver of tribal immunity, can an Indian tribe be sued for governmental or even commercial activities, whether conducted on or off a reservation. Kiowa, 523 U.S. at 754-55, 118 S.Ct. 1700.
 
 
 106
 In fact, the panel sustained the validity of the state tax at issue in this case because "the legal incidence of the Rhode Island cigarette tax falls on the consumer, not the Narragansett Tribe." Narragansett Indian Tribe of Rhode Island v. State of Rhode Island, 407 F.3d 450, 459 (1st Cir.2005). The panel also stated in its opinion that
 
 
 107
 [i]f the legal incidence of the cigarette tax falls on the Tribe itself, it presents serious tribal sovereignty concerns that might preclude the State from enforcing its tax due to the United States' recognition of the Narragansetts as a sovereign Indian tribe. Oklahoma Tax Comm'n v. Chickasaw Nation, 515 U.S. 450, 458-59, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (citing Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 483, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976)). Such a "tax cannot be enforced absent clear congressional authorization." Chickasaw Nation, 515 U.S. at 459, 115 S.Ct. 2214.
 
 Id. at 456.[19]
 
 108
 The present situation is comparable to that presented by cases and statutes involving federal enclaves in which the federal government, in addition to enforcing federal law within those enclaves, has consented to the concurrent application and jurisdiction of state laws against individuals within those lands. See, e.g., Assimilative Crimes Act, 18 U.S.C. § 13(a) (assimilating into federal law, and thereby making applicable on federal enclaves such as Army bases, certain criminal laws of the state in which the enclave is located); Lewis v. United States, 523 U.S. 155, 118 S.Ct. 1135, 140 L.Ed.2d 271 (1998). Such duality of jurisdiction, however, clearly does not constitute a waiver of sovereign immunity by the federal government absent a specific relinquishment by the United States, as is seen, for example, with the Federal Tort Claims Act. See 28 U.S.C. § 1346(b)(1) (waiving sovereign immunity with respect to certain categories of torts committed by federal employees in the scope of their employment); FDIC v. Meyer, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); Bolduc v. United States, 402 F.3d 50, 55 (1st Cir.2005).
 
 
 109
 There are further indications that no abrogation was intended by Congress by virtue of the limited language in the Settlement Act. In 1978, when Congress enacted that statute, it only provided for Rhode Island law and jurisdiction to apply in the "settlement lands." 25 U.S.C. § 1708 (emphasis supplied). However, only two years later when under similar circumstances it passed the Maine Indian Claims Settlement Act of 1980, 25 U.S.C. § 1725, Congress expressly provided that the State of Maine would have jurisdiction over "all Indians, Indian nations, or tribes or bands of Indians . . . and any lands or natural resources owned by any such Indian, Indian nation, tribe or band of Indians and any lands or natural resources held in trust by the United States" (emphasis supplied). I cannot countenance that the omission of the "tribal" language from the Settlement Act was an unintended oversight by Congress without any purpose in mind. See Brewster v. Gage, 280 U.S. 327, 337, 50 S.Ct. 115, 74 L.Ed. 457 (1930) ("The deliberate selection of language so differing from that used in . . . earlier acts indicates a change of law was intended."). This rule of statutory interpretation even holds true with regard to the addition or omission of particular language within a given statute. See Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("[When] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").
 
 
 110
 In interpreting the Maine statute containing the express inclusion of the aforementioned "tribal" language by Congress, this Court held as recently as April 15, 2005 that the mere threat of an investigation by the Maine Human Rights Commission under Maine law of an alleged discrimination charge against the Micmac Tribe "constitute[d] `enforcement'" because, in effect, such action threatened "tribal sovereignty, self-governance, and sovereign immunity," and that such an allegation was sufficient to state a federal cause of action against the State of Maine by the Micmac Tribe. Aroostook Band of Micmacs v. Ryan, 404 F.3d 48, 65-66, 68 (1st Cir.2005) (tribal sovereign immunity means that a tribe "is not amenable to state judicial or quasi-judicial proceedings to enforce those laws."). See also Bishop Paiute Tribe v. County of Inyo, 275 F.3d 893 (9th Cir.2002) (holding that execution of warrant against a tribe to obtain employee records violated tribal sovereign immunity), vacated on other grounds sub nom. Inyo County v. Paiute-Shoshone Indians, 538 U.S. 701, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003). If the mere threat of an investigation constituted prohibited enforcement sufficient to allow a federal cause of action to be stated alleging a violation by Maine of the Micmacs' tribal sovereignty, notwithstanding the fact that the Maine Settlement Act is incrementally more expansive in its language than the earlier enacted Rhode Island Settlement Act, what can be said of Rhode Island's infinitely more intrusive action of entering tribal lands and forcibly confiscating tribal property?[20]
 
 
 111
 What can be said is, first of all, that these are all actions directly affecting the Tribe's sovereignty qua tribe, for the State's invasion is a serious encroachment upon one of the most basic components of the Narragansett tribal government, its treasury. Furthermore, it can be said, these are extreme actions that clearly have not been authorized by any act of Congress. Applying fundamental principles of Indian law to these two propositions there should be no question but that the State's actions directed against the Tribe constituted a clear and egregious violation of its tribal sovereignty.
 
 
 112
 This is a result that is hinted at by the Supreme Court in Wash. v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), even if not specifically decided therein. Id. at 162, 100 S.Ct. 2069. In Colville, pursuant to Public Law 280, the State of Washington was granted almost identical civil and criminal jurisdiction on Colville Indian lands as in the case of Rhode Island regarding the Narragansetts' lands. Additionally, as with the Narragansetts, the Colville Tribe was selling cigarettes in a tribal shop without complying with Washington's tax stamp laws. The Court, in concluding that the State of Washington had sufficient interest in enforcing its valid tax laws to justify seizures of shipments of unstamped cigarettes as contraband while they were traveling to the reservation, stated that, "[b]y seizing cigarettes en route to the reservation, the State polices against wholesale evasion of its own valid taxes without unnecessarily intruding on core tribal interests." Id. at 162, 100 S.Ct. 2069.
 
 
 113
 Rhode Island instead chose the confrontational alternative of a Rambo-like raid, totally invasive of those core tribal interests. Although "[t]here is no doubt that sovereign immunity bars [Rhode Island] from pursuing the most efficient remedy" [a lawsuit against the Tribe], this is not to say "that it lacks any adequate alternatives." Potawatomi, 498 U.S. at 514, 111 S.Ct. 905. Among those remedies suggested by the Supreme Court, id., are the holding of individual agents or officers of the Tribe liable in actions brought by the State, see Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); the collection of the sales tax from cigarette wholesalers by seizing unstamped cigarettes off the reservation, Colville, 447 U.S. at 161-62, 100 S.Ct. 2069; or the assessment of wholesalers who supplied unstamped cigarettes to the tribal stores. City Vending of Muskogee, Inc. v. Okla. Tax Comm'n, 898 F.2d 122 (10th Cir.1990). Rhode Island could also "enter into agreements with the [T]ribe[ ] to adopt a mutually satisfactory regime for the collection of this sort of tax." Potawatomi, 498 U.S. at 514, 111 S.Ct. 905. Lastly, Rhode Island can also ask Congress for a specific abrogation of tribal sovereignty, id., an endeavor which should not prove to be insurmountable considering the imbalance of political forces at stake.
 
 
 114
 What is conspicuously absent from this laundry list of alternative remedies available to the State of Rhode Island is any remedy involving the State's use of its coercive police power directly against the Narragansett Tribe itself. Rhode Island presently lacks the ability to use such powers directly against the Tribe. Accordingly, I respectfully dissent from the majority's holding to the contrary.
 
 
 
 Notes:
 
 
 [16]
 In 1880, the Tribe sold all of its lands with the exception of two acres for the sum of $5,000, all in violation of the Indian Nonintercourse Act, 25 U.S.C. § 177, designed to protect Indians from being taken advantage of, and declaring voidab initio the sale of Indian lands to non-Indians unless previously authorized by the federal government. Since 1988, the Settlement Lands have been held in trust by the United States. See Carcieri v. Norton, 423 F.3d 45, 50-51 (1st Cir.2005).
 
 
 [17]
 Particularly affected are other tribes subject to settlement actsSee, e.g., Florida Indian Land Claims Settlement Act of 1982, 25 U.S.C. §§ 1741 et seq.; Mashantucket Pequot Indian Claims Settlement Act of 1983, 25 U.S.C. §§ 1751 et seq.; Seminole Land Claims Settlement Act of 1987, 25 U.S.C. §§ 1772 et seq.; Wampanoag Tribal Council of Gayhead, Inc., Indian Claims Settlement Act 1987, 25 U.S.C. §§ 1771 et seq.; Seneca Nation Settlement Act of 1990, 25 U.S.C. §§ 1774 et seq.; Aroostook Band of Micmacs Settlement Act of 1991, Pub.L. No. 102-171, 105 Stat. 1143 (1991); Mohegan Nation of Connecticut Land Claims Settlement Act of 1994, 25 U.S.C. §§ 1775 et seq.
 
 
 [18]
 More specifically, this Court, in granting the petition for en banc, withdrew only Parts II(D)(3) and (4) of the original panel opinion. This left intact all the other parts of the opinion, including Part II(D)(1) of the panel opinion, where the panel held that the Tribe's sovereign immunity remained intact despite the grant of jurisdiction to the State. This conclusion, therefore, remains the "law of the case."See majority opinion at 21, n. 3 (noting that because the en banc court, in granting rehearing, chose not to revisit the issue of whether the Tribe must comply with the State's cigarette tax scheme when selling cigarettes on the settlement lands, the panel's original holding on that issue remained intact and therefore became the law of the case).
 
 
 [19]
 It should be pointed out that this ruling by the panel affirmed the district court's finding about the applicability and incidence of the tax. The panel's ruling, in turn, was affirmed by the en banc court, since, as the majority correctly notes, the panel's ruling regarding the applicability and incidence of the tax was not withdrawn by the Court's decision to grant rehearing en banc in this case
 
 
 [20]
 The State's contention that its authority to search and seize the Tribe's property is not dependent on the search warrant because the State is independently authorized to effectuate this action pursuant to Rhode Island law, R.I. Gen. Laws § 44-20-37, is unavailing. "[T]ribal immunity is a matter of federal law and is not subject to diminution by the States."Kiowa, 523 U.S. at 756, 118 S.Ct. 1700; see also Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P.C., 476 U.S. 877, 891, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986) (same); Wash. v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 154, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (same).