# United States Court of Appeals
## For the First Circuit

No. 09-2186

GREGORIO IGARTÚA, ET AL.,

Plaintiffs, Appellants,

v.

UNITED STATES OF AMERICA, ET AL.,

Defendants, Appellees.

Before

Lynch, Chief Judge,
Torruella, Boudin, Lipez, Howard and Thompson,
Circuit Judges.

**ORDER OF COURT**
**Entered: August 4, 2011**

Plaintiffs-appellants Gregorio Igartúa and other individual citizen-residents of Puerto Rico have filed a petition for rehearing and rehearing en banc. Intervenor Commonwealth of Puerto Rico has filed a petition for rehearing en banc. Pursuant to First Circuit Internal Operating Procedure X(C), the Commonwealth's petition for rehearing en banc has also been treated as a petition for rehearing before the original panel. The petitions for rehearing having been denied by the panel of judges who decided the case, and the petitions for rehearing en banc

having been submitted to the active judges of this court and a majority of the judges not having voted that the case be heard en banc, it is ordered that the petitions for rehearing and rehearing en banc be denied.

**LYNCH**, **Chief Judge**, **BOUDIN and HOWARD**, **Circuit Judges**. The issues at the heart of this case have already received en banc review, and are not entitled to new review. Six years ago, this court did grant en banc review in Igartúa-De La Rosa v. United States, 417 F.3d 145 (1st Cir. 2005) (en banc) (Igartúa III), because of the importance of the issues, and that en banc decision controls the disposition of this petition for en banc review.

Igartúa III held, after full consideration of the issue, that the International Covenant on Civil and Political Rights (ICCPR) is not a self-executing treaty and thus is not binding as a matter of domestic law. Id. at 150. In light of this holding in Igartúa III, the antecedent question of whether the Constitution permits Congress to utilize the treaty power to extend voting rights to U.S. citizen-residents of Puerto Rico is not properly presented.

Our en banc decision in Igartúa III controls this case, despite the views of our dissenting colleagues, who wish to reopen settled issues which have already been given en banc treatment. Not only has no intervening authority called the ICCPR holding of Igartúa III into doubt, but the Supreme Court has expressly

ratified this aspect of the en banc decision.  See Medellín v. Texas, 128 S. Ct. 1346, 1356 (2008) (quoting Igartúa III, 417 F.3d at 150).

We believe Igartúa III was correctly decided and no majority of this court can, in consequence, exist for any outcome other than affirmance of dismissal of the case.  Fed. R. App. P. 35(a), which disfavors grants of petitions for en banc review, does not allow continual en banc reviews to re-examine already settled issues.

**HOWARD**, **Circuit Judge**, **concurring in the denial of rehearing en banc**.  In the main, I agree with the lead opinion for the panel majority in this case, which concluded that the issues are governed by our en banc decision in Igartúa de la Rosa v. United States, 417 F.3d 145 (1st Cir. 2005).

I had dissented in the en banc case.  In that case, I would have remanded to allow the plaintiff to further develop his claim that Article 25 of the International Covenant on Civil and Political Rights ("ICCPR") is self-executing.  I took that position because I thought that language in the text of Article 25 suggesting the self-executing nature of that provision might well trump the Senate's declaration that the treaty is not self-executing.  Since the issuance of the en banc decision, however, the Supreme Court has provided further guidance in treaty interpretation, particularly in Medellín v. Texas, 552 U.S. 491

-3-

(2008) and in Abbott v. Abbott, 130 S. Ct. 1983 (2010).

Medellín reinforced the importance of a treaty's text in its interpretation, 522 U.S. at 506, which is helpful to an extent but which would not be conclusive on the issue of whether the ICCPR's use of mandatory language in Article 25 (suggesting self-execution) or the treaty's Article 2 precatory language (suggesting that the treaty as a whole is not self-executing) should govern. Abbott, the more recent case, also analyzed a treaty's text, but it ultimately relied extensively on other interpretive sources, including the views of the Executive, the objects and purposes of the treaty as a whole, and the practices of other party states. 130 S. Ct. 1993. After Medellín and Abbott, we cannot ignore the consistent and strongly held views of the Executive and the Senate that the ICCPR is not self-executing. As a result, it is not appropriate to revisit our en banc opinion.

With respect to the issue of whether the Constitution permits Congress to extend the franchise in Congressional elections to the plaintiff, the panel's lead opinion plainly got this question right. In contrast to the colorable claim that Congress may have the power to extend the vote in Presidential elections to such persons, see Igartúa, 417 F.3d at 184-185 (Howard, J., dissenting), no substantial argument supporting the existence of a similar constitutional power with respect to Congressional elections has been advanced in any case, including this one, or in

-4-

any scholarly literature of which I am aware.

**TORRUELLA**, <u>Circuit Judge</u>. **(Concerning the denial of en banc consideration).**[1] Three members of this court have voted to deny en banc rehearing of this appeal. They take this action in blatant disregard of the dictates of Appellate Rule 35(a)(2), which endorses the rehearing en banc of "question[s] of exceptional importance."[2] By their vote, the opponents of en banc review are able to block[3] consideration by the full court of the "exceptional[ly] importan[t]" constitutional questions raised by

---

[1]Because the vote by the active judges of this court was evenly divided, Judges Lipez, Thompson and myself favoring the granting of en banc review, and Chief Judge Lynch and Judges Boudin and Howard opposing such review, my disagreement with this outcome cannot accurately be called a dissent notwithstanding that a tie vote requires the denial of en banc review pursuant to Rule 35(a) of the Rules of Appellate Procedure. <u>See</u> Fed. R. App. P. 35(a) ("A majority of the circuit judges who are in regular active service . . . may order that an appeal . . . be heard . . . by the court of appeals en banc.").

[2]Fed. R. App. P. 35(a):
>    A majority of the circuit judges who are in regular active service and who are not disqualified may order that an appeal . . . be heard . . . by the court of appeals en banc. An en banc hearing . . . is not favored and ordinarily will not be ordered unless:
>    . . .
>    (2) the proceeding involves a question of exceptional importance

[3]<u>Cf.</u> <u>Igartúa</u> v. <u>United States</u>, 626 F.3d 592, 612 n.21 (1st Cir. 2010) (Torruella, J., dissenting) (<u>Igartúa IV</u>).

the petitions,[4] which include:

> (I) Whether the Constitution <u>prohibits</u> the United States citizens residing in Puerto Rico from voting for representatives in the U.S. House of Representatives?

> (II) Whether the International Covenant on Civil and Political Rights, *ratified by the United States,* Sept. 8, 1992, 999 U.N.T.S. 171 (1966) (ICCPR), is the Law of the Land pursuant to the Supremacy Clause of Article VI of the Constitution?[5]

> (III) Whether the ICCPR establishes rights that can be judicially enforced in the courts of the United States for the benefit of the U.S. citizens residing in Puerto Rico?

> (IV) Whether Petitioners are entitled to a declaratory judgment to the effect that the United States is in violation of the ICCPR by reason of its failure to take any action to comply with the requirements of Articles 25,[6] 2(1),[7] 2(2),[8] and 2(3)[9] of the ICCPR?

---

[4]The Commonwealth of Puerto Rico has been granted leave to appear as a party, in addition to the individual citizen-appellants.

[5]U.S. Const. art. VI, cl. 2: "[A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

[6]Article 25, ICCPR: "Every citizen shall have the right and the opportunity . . . : (a) To take part in the conduct of public affairs, directly or through freely chosen representatives; [and] (b) To vote and to be elected at genuine periodic elections which shall be by universal and equal suffrage."

[7]Article 2(1), ICCPR: The United States "undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant,

Although the Appellate Rules do not provide a definition of what is a "question of exceptional importance," the issues alleged in this appeal are undoubtedly quintessential "questions of exceptional importance" because they implicate fundamental constitutional, civil and political rights of the millions of United States citizens who reside in Puerto Rico.

I am sorry to say that the vote against en banc consideration is by all appearances the result of a concerted stratagem to disparage these rights, and to prevent their litigation on a level playing field. See supra note 3. The disregard for the dictates of Appellate Rule 35(a)(2) makes this clear and forces me to protest this result in the strongest of terms.

The fundamental constitutional right at stake is the

without distinction of any kind."

[8]Article 2(2), ICCPR: The United States agrees "to take the necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such laws or other measures as may be necessary to give effect to the rights recognized in the present Covenant."

[9]Article 2(3), ICCPR: In furtherance of the rights recognized in the ICCPR, the United States commits itself "[t]o ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy," in furtherance of which the United States is obligated "[t]o ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy."

right to vote, a right which has been poignantly described as "preservative of [all] other basic civil and political rights [and whose] alleged infringement . . . <u>must be carefully and meticulously scrutinized</u>." <u>Reynolds</u> v. <u>Sims</u>, 377 U.S. 533, 562 (1964) (emphasis added). <u>See also</u> <u>Evans</u> v. <u>Cornman</u>, 398 U.S. 419, 422 (1970) ("[T]he right to vote . . . is protective of all fundamental rights and privileges."); <u>Wesberry</u> v. <u>Sanders</u>, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws . . . .").

The opponents of en banc review apparently base their opposition on personal views of the merits of this appeal, for I cannot contemplate how they can rationally conclude that the issues raised are not of "exceptional importance." Yet, at this procedural crossroads, the merits of this controversy are irrelevant to the initial decision that must be made as to the gravity of these issues. <u>See generally</u> Michael E. Solimine, <u>Due Process and En Banc Decisionmaking</u>, 48 Ariz. L. Rev. 325, 337-38 (2006) ("The time to fully address the merits of the case and the correctness of the panel decision's result is when, and if, rehearing en banc is granted, and the case is rebriefed and argued on the merits."). Apart from disregarding Rule 35, proceeding <u>sub silentio</u> to exercise their vote based on their views of the merits of this appeal undermines the very notion of Rule 35, as embodied

-8-

in Rule 35(a)(2), that issues of importance be considered and decided by the entire court, acting together _after_ rebriefing, reargument, and engaging in the crucible of joint deliberation.

Because of the negative manner in which Rule 35(a) is framed ("An en banc hearing . . . is not favored . . . ."), most discussions dealing with the exercise of discretion under Rule 35(a)(2) are found in dissenting opinions of cases denying en banc review. Thus, in _Ricci_ v. _DeStefano_, 530 F.3d 88, 93 (2d Cir. 2008), Chief Judge Dennis Jacobs, in his dissent from denial of rehearing en banc, in language apropos to the present appeal stated:

> Th[e] occluded view of our discretion to sit in banc runs counter to the criteria set down for our guidance in Rule 35. No doubt, the proper exercise of discretion results in denial of review in the overwhelming number of cases. And the resulting pattern may resemble the pattern of denial that would result from saying "no" by tradition. But the decision to grant or deny in banc review is like any other discretionary decision in the sense that discretion should be exercised, not elided or stuck in a default position. _See United States_ v. _Campo_, 140 F.3d 415, 419 (2d Cir. 1998) (per curiam) (holding that "refusal to exercise discretion accorded [the court] by law . . . constitutes an error of law"). The exercise of discretion to hear cases in banc is integral to the judicial process.
>
> . . . If issues are important enough to warrant Supreme Court review, they are important enough for our full Court to consider and decide on the merits. Of course, if an in banc poll discloses broad-based agreement with the panel opinion, in banc review may be spinning wheels. Under such

circumstances, it may very well be an appropriate exercise of discretion to deny rehearing in banc. But to rely on tradition to deny rehearing in banc starts to look very much like abuse of discretion.

The denial of en banc review to petitions which raise constitutional questions of the magnitude implicated in this case, which fundamentally affect a population of United States citizens larger in number than that of the combined populations of all the jurisdictions in this circuit except Massachusetts, as well as that of twenty-two other States individually,[10] is a gross abuse of discretion. As Professor Solimine, who has written extensively on the issues raised by en banc proceedings, has cogently stated, "[t]he importance of a case would seem to increase as the size and population of the affected geographical area increases."[11] This is a proposition which, I submit, clearly fits the fundamental constitutional issues raised by Puerto Rico and its citizens in the present appeal.

In looking for a principled definition of what is a question of "exceptional importance," it may be of some use to look to the appeals in which this circuit has granted en banc rehearing, and compare the issues in those appeals with those raised by the

_____

[10]See United States Census 2010 Resident Population Data, available at http://2010.census.gov/2010census/data/apportionment-pop-text.php.

[11]Michael E. Solimine, Ideology and En Banc Review, 67 N.C.L. Rev. 29, 66 (1988).

present petitions.  This court has allowed en banc review in a grand total of ten cases in the last five years, although none has been granted in the last two years.[12]  The total number of en banc cases heard during this period represents less than 1% of the 914 petitions presented, with granted en banc petitions amounting to an infinitesimal proportion of the total of 10,372 appeals presented during the same period and through March 31 of this year.

A perusal of the issues raised in the cases in which we granted en banc review during this five-year period is of use in

_____

[12]    2011 n/a

2010 n/a

2009 SEC v. Tambone, 597 F.3d 436 (1st Cir. 2010)
      United States v. Textron, 577 F.3d 21 (1st Cir.
          2009)

2008 Aronov v. Napolitano, 562 F.3d 84 (1st Cir. 2009)
      United States v. Giggey, 551 F.3d 27 (1st Cir. 2008)

2007 United States v. Santiago, 519 F.3d 1 (Cir. 2008)

2006 Carcieri v. Kempthorne, 497 F.3 15 (1st Cir. 2007)
      Castañeda-Castillo v. Gonzalez, 488 F.3d 17 (1st
          Cir. 2007)
      Narragansett Indian Tribe v. Rhode Island, 449 F.3d
          16 (1st Cir. 2006)
      United States v. Scherrer, 444 F.3d 91 (1st Cir.
          2006)
      United States v. Jimenez-Beltre, 440 F.3d 514 (1st
          Cir. 2005)

determining the legitimacy of the criteria used in denying en banc review in the present appeal. Not to dwell unnecessarily on the point, I will briefly describe the issues raised in just the last four granted en banc petitions. It should be noted that these appeals are generally representative of the cases that received en banc hearings during the last five years. From them we can readily discern that at a minimum, the magnitude of importance of the questions in the present appeals, in which en banc is denied by reason of a tie vote, is at least of equal importance to those cases on which en banc review was granted.

In SEC v. Tambone, 597 F.3d 436, 438 (1st Cir. 2010), the issue was whether defendant underwriters' use of false and misleading prospectus statements constituted the "making of statements" that rendered them primarily liable under SEC Rule 10b-5. In United States v. Textron, 577 F.3d 21, 22 (1st Cir. 2009), the issue was the right of the IRS to engage in discovery regarding "tax accrual work papers," which were claimed to be the work product of counsel in contemplation of litigation. In Aronov v. Napolitano, 562 F.3d 84, 85-86 (1st Cir. 2009), the question was whether undue delay by the U.S. Citizenship and Immigration Service in processing a citizenship application, thus requiring legal action by the applicant, entitled the prospective citizen to recover attorney fees against the government under the Equal Access to Justice Act. United States v. Giggey, 551 F.3d 27 (1st Cir.

-12-

2008), which went to en banc directly, without a prior panel hearing or decision, involved Sentencing Guideline issues related to the "categorical approach" to burglary convictions and whether they constitute "crimes of violence" under the guidelines.

Without debasing the importance of these cases, can it be seriously argued that the issues presented in them meriting the granting of en banc consideration are of greater importance than those presented by the present appeal?  The statement of Chief Judge Winter in Falwell v. Flynt, 805 F.2d 484, 489 (4th Cir. 1986) (Winter, C.J., dissenting from denial of rehearing en banc), rev'd on other grounds, 108 S. Ct. 876 (1988), is apropos: "Why, when the court has freely granted rehearings in banc in recent years in many cases less significant, it declines to do so here, is inexplicable."  I further add that, as Judge Murnaghan has written, "[i]t is distasteful to me to see the work of the court take on the guise of a roulette wheel operated by chance."  Beatty v. Chesapeake Ctr, Inc., 835 F.2d 71, 75 n.1 (4th Cir. 1987) (en banc) (Murnaghan, J., concurring).

Whether a question meets the standard of "exceptional importance" should be determined by objective criteria,[13] and should not depend -- as some have suggested -- on whether it is

---

[13]Solimine, supra note 11, at 33.

exceptional in the "eye of the beholder"[14] or because "one knows it when one sees it."[15]  Judging from a comparison of the cases in which we have granted or denied en banc review one cannot help but wonder if those are the criteria that are prevalent in this circuit when considering en banc petitions.  I fret to think that such frivolous non-standards prevail when testing whether matters as portentous as those presented by these petitions are in the balance. Yet, more and more the granting or denial of en banc review has become a function of the roulette wheel previously alluded to, and from the standpoint of the rights of the petitioners, Russian roulette at that.

The views of other judges regarding what constitutes an issue of exceptional importance should inform this court on this matter.  Judge Kozinski advocated for en banc review of cases where "[t]he result reached threatens a potentially serious and widespread infringement of personal liberties."  Int'l Olympic Comm. v. San Francisco Arts & Athletics, 789 F.3d 1319, 1320 (9th Cir. 1986) (Kozinski, J., dissenting from denial of rehearing en banc).  Judge Easterbrook has said that "the questions of principle glossed over by the panel's opinion are far more important than the outcome of th[e] case, and they are worth the extra judicial time

---

[14]Jon O. Newman, In Banc Practice in the Second Circuit: The Virtues of Restraint, 50 Brook. L. Rev 365, 371 (1984).

[15]Solimine, supra note 11, at 51 (quoting from a private interview with an appellate judge).

necessary to get them right." Serpas v. Schmidt, 827 F.3d 23, 40 (7th Cir. 1987) (Easterbrook, J., dissenting from denial of rehearing en banc). Judge Robinson, joined by Judges Edwards and Ginsburg, stated that "[i]n the exceptional case . . . en banc rehearing may be appropriate to cure gross individual injustice." Church of Scientology v. Foley, 640 F.2d 1335, 1341 n.46 (D.C. Cir. 1981) (Robinson, J., dissenting from denial of rehearing en banc), cert. denied, 452 U.S. 962 (1981).

Given the apparent reliance by the opponents of en banc review on their view of the merits of this appeal, I am forced to briefly summarize my views regarding the issues raised by this appeal lest they be obscured in the event of higher review.[16]

As an initial point I believe it is worth stating that the issues decided by the panel in this case are different from those passed upon in previous Igartúa cases.[17] This much is conceded by Chief Judge Lynch in her lead panel opinion in the present appeal. See Igartúa IV, 626 F.3d at 595 ("These cases inform our analysis of this admittedly different, but related

---

[16]"[C]ourts of appeals should decide whether Rule 35 criteria have been met, regardless of the likelihood of subsequent Supreme Court review. What is important for Rule 35 purposes may not be the same for what the Court regards as important for its own, nationwide agenda." Solimine, 48 Ariz. L. Rev. at 340.

[17]Igartúa de la Rosa v. United States, 32 F.3d 8 (1st Cir. 1994) ("Igartúa I"); Igartúa de la Rosa v. United States, 229 F.3d 80 (1st Cir. 2000) ("Igartúa II"); Igartúa de la Rosa v. United States, 417 F.3d 145 (1st Cir. 2005) (en banc) ("Igartúa III").

question.").  I thus find it disingenuous for the judges that oppose en banc to claim as grounds for denying en banc review, that "[t]he issues at the heart of this case have already received en banc review and are not entitled to new review."  See statement concerning denial of en banc at 2.

The constitutional violations inflicted on Petitioners are the direct result of the dubious theories invented over a century ago by academic alchemists at noted Northeastern universities.[18]  Thereafter, they were adopted by the Supreme Court[19] to justify keeping Puerto Rico and other territorial booty acquired by the United States after the Spanish-American War of 1898 in a

---

[18]See Simeon E. Baldwin, The Constitutional Questions Incident to the Acquisition and Government by the United States of Island Territory, 12 Harv. L. Rev. 393 (1899); C.C. Langdell, The Status of Our New Territories, 12 Harv. L. Rev. 365 (1899); Abbott Lawrence Lowell, The Status of Our New Possessions: A Third View, 13 Harv. L. Rev. 155 (1899); John Kimberly Beach, Constitutional Expansion, 8 Yale L.J. 225 (1899); Paul R. Shipman, Webster on Territories, 9 Yale L.J. 185 (1900).  This academic hawkishness was in keeping with the Northeast's expansionist mantra, of which Massachusetts was the epicenter, led by its preeminent Senator, Henry Cabot Lodge.  See Juan R. Torruella, Global Intrigues: The Era of the Spanish-American War and the Rise of the United States to World Power 172 (2007); see also William C. Wednor, Henry Cabot Lodge and the Search for American Foreign Policy 120 (1980).

[19]De Lima v. Bidwell, 182 U.S. 1 (1901); Goetze v. United States, 182 U.S. 221 (1901); Dooley v. United States, 182 U.S. 222 (1901); Armstrong v. United States, 182 U.S. 243 (1901); Downes v. Bidwell, 182 U.S. 244 (1901); Huus v. N.Y. & P.R.S.S. Co., 182 U.S. 392 (1901).  See also Balzac v. Porto Rico, 258 U.S. 298 (1922).

subjugated colonial status <u>ad infinitum</u>.[20]  The rules thus created are analogous to, and contemporaneous with, the discredited <u>Plessy v. Ferguson</u>, 163 U.S. 537 (1896), doctrine.  Lest there be any doubt about the nature of what is at issue in the present appeal, I believe the writings on this subject of Rubin Frances Weston, an eminent historian and political scientist, are worth referring to at this time:

> Those who advocated overseas expansion faced this dilemma: What kind of relationship would the new peoples have to the body politic?  Was it to be the relationship of the Reconstruction period, an attempt at political equality for dissimilar races, or was it to be the Southern "counterrevolutionary" point of view which denied the basic American constitutional rights to people of color?  The actions of the federal government during the imperial period and the relegation of the Negro to a status of second-class citizenship indicated that the Southern point of view would prevail.  The racism which caused the relegation of the Negro to a status of inferiority was to be applied to the overseas possessions of the United States.[21]

It is this colonial regime, unsupportable when judged by today's legal, constitutional, and moral standards, that is kept in place and buttressed by this court's failure to rehear this appeal

---

[20]<u>See</u> Juan R. Torruella, <u>The Insular Cases: The Establishment of a Regime of Political Apartheid</u>, 29 U. Pa. J. Int'l L. 283 (2007).

[21]Rubin Francis Weston, <u>Racism in U.S. Imperialism: The Influence of Racial Assumptions On American Foreign Policy, 1883-1946</u> 15 (1972).

en banc, thus allowing the panel opinion to stand. Furthermore, the constitutional scenario since the banc decision in Igartúa III six years ago has changed to such a degree as to justify reconsideration of that ill-advised and fractured opinion. See Boumediene v. Bush, 553 U.S. 723, 758 (2008) ("It may well be that over time the ties between the United States and any of its unincorporated Territories [have] strengthen[ed] in ways that are of constitutional significance."); United States v. Laboy-Torres, 553 F.3d 715, 721 (3d Cir. 2009) (O'Connor, Associate Justice, Retired) (stating that Puerto Rico "'seem[s] to have become a State within a common and accepted meaning of the word.'") (quoting United States v. Steele, 685 F.2d 793, 805 n.7 (3d Cir. 1982) (internal citations omitted)). Cf. Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 672 (1974) ("Puerto Rico has not become a State in the federal Union like the 48 States, but it would seem to have become a State within a common and accepted meaning of the word." (quoting Mora v. Mejias, 206 F.2d 377, 387 (1st Cir. 1953))). This, when added to the changes that have taken place in the composition of this court since Igartúa III was decided, should counsel convening a new en banc court to allow the expression of views on these exceptionally important questions from all the present members of this court.

As stated in my separate panel opinion, see Igartúa IV, 626 F.3d at 612 (Torruella, J., concurring in part; dissenting in part), although I am of the view that Article I, Section 2 of the

-18-

Constitution does not grant the citizen-appellants the <u>right</u> to select voting Representatives to the House of Representatives, neither does the Constitution <u>prohibit</u> such an outcome.[22]  Although this may seem at first glance a mere theoretical topic for academic discourse not directly at issue in this appeal, in fact this is a key matter in considering the failure of the United States to comply with its treaty obligations under the ICCPR.[23]  Stated more explicitly: (1) there is <u>no prohibition</u> in Article I, or elsewhere in the Constitution, against the granting of voting rights to United States citizens who reside in the territories; (2) pursuant to <u>Missouri</u> v. <u>Holland</u>, and Congress' plenary powers over territories under the Territorial Clause of the Constitution,[24] Congress has the power to grant voting rights to these citizens, but has failed to

---

[22]U.S. Const. art. I, § 2: "[T]he House of Representatives shall be composed of Members chosen every Second Year by the People of the several States."

[23]<u>Cf.</u> <u>Missouri</u> v. <u>Holland</u>, 252 U.S. 416 (1920) (stating that Congress can act beyond its enumerated Article I powers when implementing a treaty obligation).  It is also relevant to the question whether Petitioners present a justiciable controversy for which a remedy is available under the Declaratory Judgment Act. <u>See</u> 28 U.S.C § 2201 et seq.  <u>Cf.</u> <u>Leal-Garcia</u> v. <u>Texas</u>, 131 S. Ct. 2866 (2011) (no issue of standing raised, Court considered the merits of petitioners claims, notwithstanding the Vienna Convention was held to be non-self executing).

[24]U.S. Const. art. IV, Sec. 3: "Congress shall have the Power to dispose of and make all needful Rules and Regulations respecting the Territory and other Property belonging to the United States; and nothing in the Constitution shall be construed as to Prejudice any Claims of the United States, or of any particular State."

exercise this power;[25] (3) because of its inaction, the United States is in violation of its obligations under the ICCPR; (4) as will be further discussed, the ICCPR is domestic law of the United States by virtue of the Supremacy Clause; (5) the ICCPR has created individual rights which protect the citizens of the United States residing in Puerto Rico; (6) the ICCPR guarantees to these citizens access to the courts of the United States to validate these rights; (7) the United States, having failed to grant voting rights to its citizens residing in Puerto Rico commensurate to those of its citizens in the rest of the Nation, is in violation of domestic law as infused by its treaty obligations under the ICCPR, see supra note 23 (discussing issue of standing); (8) Petitioners are entitled to a declaratory judgment to the effect that the failure of the United States to grant them equal voting rights is a violation of the ICCPR. My detailed views on the merits of these issues are fully discussed in my panel opinion and need not be further elaborated at this time. I must, however, clarify a certain obfuscation brought about by the views of the opponents to en banc review.

The joint opposing opinion makes much of what it characterizes as the Supreme Court's express ratification of Igartúa III's holding that the ICCPR is not self-executing. See Medellín v. Texas, 552 U.S. 491, 505 (2008) (citing Igartúa III, 417 F.3d at

_____

[25]This is a distinction from the situation with the District of Columbia, where Congress's power derives from Article I, § 8, cl. 17.

-20-

150). Although at first glance this appears to be an appealing argument, further analysis shows that it rests on a shaky foundation. Firstly, in Medellín, the Supreme Court was dealing with the Vienna Convention and not the ICCPR, and so any reference to the latter is at best dicta. See Leal-Garcia v. Texas, 131 S. Ct. at 2687 (Medellín v. Texas involved interpretation of the Vienna Convention). The passing reference by the Supreme Court to Igartúa III states that "while treaties 'may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be "self-executing" and is ratified on those terms.'" Medellín, 552 U.S. at 505. This is hardly a remarkable or novel statement of international or domestic law, and does not demonstrate that the Supreme Court intended to express a view as to whether the ICCPR, in particular, is or is not self-executing.[26]

The Supreme Court, like the majority in Igartúa III, did not engage in an analysis of either the ICCPR's text or it history, and it did not inquire into the post-ratification understanding of the signatory nations as to whether the ICCPR is self-executing. As Judge Howard suggested in his dissent in Igartúa III, see 417 F.3d

---

[26]The recycling of judicial error by the parroting of prior decisions without independent and thorough analysis has been properly dubbed "a judicial game of 'telephone,'" in an article specifically targeting the First Circuit. See Adam D. Chandler, Note, Puerto Rico's Eleventh Amendment Status Anxiety, 120 Yale L.J. 2183, 2191 (2011)

at 189 (Howard, J., dissenting), "a court must conduct an independent and searching inquiry into the treaty's purpose." The majority and the dissent in Medellín, although reaching different conclusions, at least provided such an analysis of the Vienna Convention. They did not, however, present a comparable analysis with respect to the ICCPR because this was not an issue before the Court. The panel opinion in this case and the majority opinion in Igartúa III both similarly failed to provide a thorough analysis of the relevant ICCPR provisions before concluding that the ICCPR is, in its entirety, non-self-executing.

It is now beyond cavil that the interpretation and administration of a treaty are matters within the exclusive jurisdiction of the courts of the United States. The Paquete Habana, 175 U.S. 677, 700 (1900). Thus, whether the ICCPR is the Law of the Land "is, of course, a matter for [the courts] to decide." Medellín, 552 U.S. at 519. It is the courts and not other branches of government that, upon examining a treaty's text (or when its meaning is not apparent from the text, its history), must determine whether the treaty creates individual rights or is non-self-executing.

As stated repeatedly by the Supreme Court, and most recently in Abbott v. Abbott, 130 S. Ct. 1983, 1990 (2010), "[t]he interpretation of a treaty . . . begins with its text." See also Medellín, 552 U.S. at 562 (explaining that "explicit textual

-22-

expression" is the focus of the self-execution analysis); <u>United States</u> v. <u>Alvarez-Machain</u>, 504 U.S. 655, 663 (1992) (stating that courts look first to a treaty's terms to determine its content). The opponents of en banc review abdicate their constitutional duty to make an independent and thorough assessment of the meaning and import of the ICCPR.

There is nothing in the content of the ICCPR, or for that matter in its history,[27] that supports an interpretation that the parties to said treaty were not creating individual rights or that the ICCPR was not a self-executing treaty in favor of establishing enforceable rights for the citizens of the party-signatories. Article 25 of the ICCPR provides without equivocation that "every <u>citizen</u> <u>shall</u> have the right to vote . . . at genuine periodic elections which <u>shall</u> be by universal and equal suffrage" (emphasis added). This right is implemented and given self-executing force by the other provisions of the ICCPR. These include Article 2(1), in which the United States "undertakes to respect and to ensure to all <u>individuals</u> within its territory . . . the rights recognized . . . without distinction of any kind" (emphasis added); Article 2(2), in which the United States agrees "to take the necessary steps, in accordance with its constitutional processes . . . to adopt such laws or other measures as may be necessary to give effect

---

[27]See <u>Igartúa IV</u>, 626 F.3d at 631-633, for a detailed summary of its history and the United States' vigorous participation throughout its negotiations.

to the rights recognized in this Covenant"; and Article 2(3), which commits the United States to further these rights by "ensur[ing] that any <u>person</u> whose rights . . . are violated <u>shall have an effective remedy</u>," and obligating the United States to ensure that "any <u>person</u> claiming such a remedy <u>shall have his right thereto determined by competent judicial . . . authority . . . and to develop the possibilities of a judicial remedy</u>" (emphasis added). This language unequivocally establishes individual rights that can be individually enforced in the courts of the signatory countries to the ICCPR -- which of course includes the United States.

In summarily discussing these issues, some courts, including our own, have failed to engage in an in-depth analysis of the text or history of the ICCPR, or of the domestic legal consequences that follow by virtue of the Supremacy Clause. Had they done so, they would have discovered that the Senate did not express "reservations" about Articles 2 and 25 of the ICCPR.[28] They would have found that the alleged non-self-execution of the ICCPR relies exclusively on statements made in the ratification process of the ICCPR.[29] Such declarations are, of course, not the Law of

_____

[28]<u>See</u> 138 Cong. Rec. 8070-71.

[29]<u>See</u> S. Exec. Rep. No. 102-23 (1992), <u>reprinted in</u> 31 I.L.M. 645, 657 (conditioning the Senate's consent on the United States' <u>declaration</u> that the treaty be non-self-executing); <u>see also</u> <u>id.</u> at 660 (reprinting a letter from the President to the Senate requesting ratification of the ICCPR). <u>But see</u> 138 Cong. Rec. 8070 (1992) (statement of Sen. Daniel Moynihan) ("Even though the

-24-

the Land; only reservations are part of the treaty and become the Law of the Land.  See Igartúa IV, 626 F.3d at 624 (Torruella, J., dissenting); Igartúa III, 417 F.3d at 190 (Howard, J., dissenting); United States v. Stuart, 489 U.S. 353, 374-75 (1989) (Scalia, J., concurring in the judgment).  Therefore, they would have concluded that the United States is in clear violation of its obligations under Articles 2 and 25 of the ICCPR as it has failed to take any steps to comply with its obligations under said provisions.  In short, had this court given these issues the attention they deserve, they would have found that the petitioners are entitled, as a matter of domestic law, to a declaratory judgment stating that the United States is in violation of its obligations under the ICCPR.

Even, however, if the relevant portions of the ICCPR are not self-executing -- that is, even if they do not create a private cause of action -- I believe that would not preclude a federal court from issuing a declaratory judgment stating that the United States is in violation of its obligations under the ICCPR.  Treaties have been described as akin to "contracts" between nations.  See Whitney v. Robertson, 124 U.S. 190, 194 (1888); Foster v. Neilson, 27 U.S. 253, 314 (1829) (describing the terms of some treaties as "import[ing] a contract").  As such, one should presumably expect a treaty to create obligations of some sort between the parties.

_____

Convention is non-self-executing, the[] [provisions of the ICCPR] will now become binding obligations of the United States.")

Now, it may be the case that some treaties -- the non-self-executing ones -- do not, simply by virtue of ratification, create obligations owed to a ratifying nation's private citizens. But I do not see that it follows that such a treaty would create no obligations, of any kind, between any of the contracting parties.[30] Such a view would suggest that ratification of a treaty, no matter how momentously it is portrayed, amounts to little more than words without weight or validity, and ritual without consequence. I, for one, do not believe we should be so quick to consider a treaty as significant as the ICCPR as just so much high-level blathering.

Thus, even if the ICCPR does not create an obligation owed in the first instance to American citizens, including those residing in Puerto Rico, it must still create an obligation on the part of the United States as a contracting party to abide by the terms of the supposed "contract" it ratified. A federal court may not be empowered to direct Congress to make good on those obligations by ordering it to enact executing legislation. But I fail to see why a court is not empowered to point out when Congress' failure to do so means that the United States is in clear violation of the obligations it purported to accept when it ratified the treaty.[31]

---

[30]See statement of Sen. Moynihan reproduced in footnote 29, ante.

[31]In Foster v. Neilson, the Supreme Court suggested that some treaties might "address[]" themselves "to the political, not the judicial department" inasmuch as in some cases the legislature "must execute the contract before it can become a rule for the

Rejecting even the possibility of a declaratory judgment to this effect is especially mystifying when past experience suggests that the political branches of government are likely to abide by an authoritative declaration of United States law, including commitments made by the United States through ratification of a treaty (self-executing or otherwise). See Juda v. United States, 13 Cl. Ct. 667 (1987) ("Juda II"); Juda v. United States, 6 Cl. Ct. 441 (1984) ("Juda I").

Finally, I must respectfully disagree with Judge Howard's claim that the Supreme Court's recent opinion in Abbott v. Abbott, 130 S. Ct. 1983 (2010), is at all helpful in resolving this case. Judge Howard suggests that Abbott somehow enhanced the significance of the views of the executive on the status of a treaty. Abbott did no such thing. Abbott's discussion of the State Department's position on so-called ne exeat rights came after the majority had already presented a conclusive argument explicitly based on the text of the relevant convention. See Abbott, 130 S. Ct. at 1990-93. Based on its examination of the convention's text, the majority conclusively stated that a ne exeat right was a "right of custody under the Convention," and rejected the opposing view as "illogical and atextual." Id. at 1992 (emphasis added). It was only then that

Court." 27 U.S. 253, 314 (1829). The Supreme Court did not say that such a treaty did not create any obligations whatsoever, nor did it suggest that the "judicial department" might be prohibited from noting when the political department has not yet done what it (ostensibly) contracted to do.

-27-

the majority turned to consider the State Department's views on the matter. The appeal to the State Department's position was thus dicta, a fact that the majority acknowledged by characterizing those views as "support[ing]" and "inform[ing]" its holding, not as crucial to it.

Abbott thus does not support the view that a Senate declaration might overwhelm the clear language of Article 25 of the ICCPR. At most, what Abbott suggests is that how the executive branch describes a convention may help corroborate the result of what has been, and still is, primarily a textual inquiry. I agree with Judge Howard to the extent that he considers the language of Article 25 to be "mandatory," and thus clearly suggests self-execution. I therefore cannot see that dicta from Abbott is at all useful in resolving this case.

It has now been over half a century since Brown v. Board of Education, 347 U.S. 483 (1954), was decided, and well over a century since Puerto Rico's colonial status was legitimized by the courts of this Nation. Notwithstanding that the rights established under the ICCPR provide this court with principled grounds for correcting this intolerable stigma of inequality, this avenue is foreclosed and blocked by those who are entrenched on the wrong side of history. By their veto, the opponents of en banc review continue to support the outdated anachronisms that maintain the United States citizens of Puerto Rico in their pervasively undemocratic and "un-

-28-

American" condition.  This is particularly ironic at a time when this Nation's lives (including those of United States citizens residing in Puerto Rico) and treasure are placed in harm's way to promote the values that are defeated by the opposing votes.

History will not judge these actions kindly.

**LIPEZ**, <u>**Circuit Judge**</u>, **dissenting from the denial of rehearing en banc**.  Rule 35(a) of the Federal Rules of Appellate Procedure provides for en banc rehearing when "the proceeding involves a question of exceptional importance."  Fed. R. App. P. 35(a)(2).  The right of United States citizens to vote for, and be represented by, full-status members of Congress must be counted among the few matters that facially meet the "exceptional importance" prerequisite.  As the Commonwealth of Puerto Rico argued in its motion to intervene in this case, granted by a majority of the panel, "the legal issues implicate matters of fundamental concern to the almost four million Puerto Rico residents who are U.S. citizens yet have no voting representation in the legislature of the government of this Nation."  Motion to Intervene, at 4. Indeed, given our court's continuing struggle with these important issues – reflected in the three separate opinions produced by the panel – this is the rare case in which en banc review should be granted without hesitation.[32]  Hence, I am dismayed and saddened

---

[32]Rule 35(a) states that "[a]n en banc hearing or rehearing is not favored and ordinarily will not be ordered," but exceptions exist where "en banc consideration is necessary to secure or

that three of my colleagues have shut the door on review by the full court.  I therefore dissent from the denial of rehearing en banc.

I concurred in the judgment in this case because I believed the panel could not properly reconsider issues that were decided by the full court as part of our 2005 en banc ruling that Puerto Rico citizens did not have the right to vote in presidential elections.  See Igartúa-De La Rosa v. United States (Igartúa III), 417 F.3d 145 (1st Cir. 2005) (en banc).  I emphasized in my concurrence here, however, that the magnitude of the issues and Judge Torruella's forceful dissent compel us to grant en banc consideration of the plaintiffs' claims of entitlement to representation in Congress.  Igartúa v. United States, 626 F.3d 592, 607 (1st Cir. 2010) (Igartúa IV).  Indeed, this is the classic case anticipated by Rule 35(a)(2)'s "exceptional importance" provision – one so unusually challenging and significant that the issues it raises deserve the attention of the full court, informed by the superior advocacy that ordinarily accompanies such comprehensive review.

Reconvening our en banc court to consider the voting rights of citizens residing in Puerto Rico is necessary because the significant issues that would be addressed were either not explicitly considered in 2005 or require a more developed analysis

maintain uniformity of the court's decisions" or "the proceeding involves a question of exceptional importance."

-30-

in light of intervening Supreme Court precedent and "the evolution of scholarly and official opinion in the five years since Igartúa III." Petition of the Commonwealth of Puerto Rico for Rehearing En Banc, at 6. It is not enough to say that those issues must ultimately be decided by the Supreme Court. That evasion simply states the obvious. As an intermediate appellate court, we have our own responsibility to grapple in the first instance with the unique, challenging, and unavoidably controversial questions presented by this case.

As more fully described in my concurring opinion, two specific issues warrant en banc consideration:

1. The Constitutional Question. The threshold question we must face is whether the Constitution permits Congress to provide Puerto Rico residents with the right to vote. This issue was not explicitly addressed in the 2005 en banc, in which we concluded that the Constitution does not require extending the right to vote to citizens residing in Puerto Rico. I continue to believe that we were correct in holding that the Constitution does not mandate voting rights for Puerto Ricans. But the separate question of whether Congress has the authority through legislation or adoption of a treaty to provide the right to vote to Puerto Rico residents remains unaddressed. In effect, we presumed that because the Constitution itself enfranchises only citizens of "States," only such citizens could be given the right to vote. The question,

however, is whether conferring the right to vote on state residents in the Constitution necessarily forecloses Congress from extending the right to others. That is not a question that I even contemplated in 2005. However, as noted in my concurrence, the possibility that the Constitution would permit such an extension of voting rights has in the intervening years been articulated by scholars and judges and is "worthy of serious examination." Igartúa IV, 626 F.3d at 608.

2. <u>The Treaty Question.</u> Even if the Constitution permits enfranchising citizens in Puerto Rico, the question remains whether the ICCPR, or some other treaty, has created an enforceable voting right on their behalf. The 2005 en banc court held that the ICCPR was not self-executing and thus did "not adopt any legal obligations binding as a matter of domestic law." Igartúa III, 417 F.3d at 150.[33] The en banc majority's conclusion was based on a Senate declaration to that effect and cursory references by the Supreme Court (in <u>Sosa</u> v. <u>Alvarez-Machain</u>, 542 U.S. 692 (2004)) appearing to accept the declaration as dispositive of the issue. Id. Judge Howard cogently explained in his 2005 en banc dissent why the majority was wrong, pointing out that the Senate lacks the authority to declare the status of a treaty. Id. at 189-91 (Howard, J.,

---

[33]A non-self-executing treaty does not itself create obligations enforceable in the federal courts and must instead rely on Congressional adoption of those obligations in separate legislation.

-32-

dissenting).[34]

I did not at the time appreciate the appropriateness of Judge Howard's focus because I did not contemplate the possibility that the Constitution might permit enfranchising Puerto Rico residents. If the Constitution forbids extending the right to vote to Puerto Ricans, it would trump any treaty purporting to do so and the ICCPR's status would be irrelevant to our assessment of the plaintiffs' claims. I now realize the importance of Judge Howard's analysis. If the Constitution allows the enfranchisement of Puerto Ricans, the ICCPR's status is relevant to whether plaintiffs have a private cause of action for deprivation of the right to vote that they say the treaty guarantees to them. In his dissent in this case, Judge Torruella argues forcefully that the surrounding circumstances demonstrate that the ICCPR should in fact be construed as a self-executing treaty. I have reached no conclusion on the merits of this argument. It is apparent, however, that we need to

---

[34]As I reported in my concurrence in this case:

Judge Howard explained that the Senate's non-self-execution declaration concerning the domestic effect of the ICCPR was "in reality[] an attempt to legislate concerning the internal implementation of a treaty," which the Senate lacked the power to do. Igartúa III, 417 F.3d at 190-91 (dissenting opinion). Judge Howard noted that the declaration was therefore "merely an expression of the Senate's view of domestic policy . . . [with] no domestic effect." Id. at 191.

Igartúa IV, 626 F.3d at 610 n.19.

-33-

confront it.  The Supreme Court has recently confirmed that determining whether a treaty is self-executing "is, of course, a matter for [the courts] to decide."  Medellín v. Texas, 552 U.S. 491, 518 (2008).[35]

As noted, I have not advocated for en banc review in this case because I know the answers to the difficult questions that I have identified.  Rather, I have voted for en banc review because I am certain that the denial of en banc review, whatever the justification offered by my colleagues, is incompatible with our collective obligation to decide questions of "exceptional importance" through the en banc process.  Rule 35(a)(2) is not some meaningless formality.  Instead, the rule recognizes that some issues are simply too important to be decided in the ordinary manner

_____

[35]Despite the 2005 majority's assertion (based on Supreme Court language) that the ICCPR is not self-executing, neither the en banc panel nor the Supreme Court performed a close examination of the treaty.  An inquiry into the status of a treaty must begin with the treaty language itself.  Medellín, 552 U.S. at 514.  In Medellín, the Court, considering a different treaty, also looked to the "'postratification understanding' of signatory nations," id. at 516, "general principles of interpretation," id. at 517, and the consequences of reading the treaty in a particular way, id. at 517-518.  See also Sanchez-Llamas v. Oregon, 548 U.S. 331, 344 & n.3, 347 (2006) (considering other signatories' understanding of the treaty at issue).  Neither the 2005 majority nor the Supreme Court considered such factors in labeling the ICCPR as non-self-executing.  Indeed, as the Commonwealth points out in its petition for en banc review, the Supreme Court in Sosa was "not confronted with, and did not determine, whether the Senate's declaration establishes that the ICCPR has no domestic legal effect."  Petition of the Commonwealth of Puerto Rico for Rehearing En Banc, at 12.

by a panel of three judges. It recognizes that circuit judges should not presume that they know the answers to exceptionally difficult questions before they engage with all of their colleagues after briefing and argument of the highest quality.

Look at the missed opportunity here. The Commonwealth, now allowed to intervene, was represented by a law firm with substantial Supreme Court litigation experience. Its lead lawyer in the case was the former Solicitor General of the United States. The United States was ably represented by the Department of Justice. In addition, as we have done in other en banc proceedings involving questions of exceptional importance, we could have invited amicus participation from legal scholars, historians, and other interested parties. For the first time, the complex issues that I have identified would have received the adversary testing that they require. For the first time, the Commonwealth's views on those issues would have received from this court the respectful consideration that they deserve.

My colleagues who have voted against en banc review undoubtedly believe that the en banc process – always burdensome and frequently divisive – would be a waste of time because, unlike me, they are confident that they already know the answers to the constitutional and treaty questions that I have identified. Their premature certitude is the problem. It is untested by the vigorous examination that the en banc process provides. It arises from a

flawed and incomplete consideration of the issues.

The threshold question in this case – whether the Constitution permits Congress to extend voting rights to the residents of Puerto Rico – was not addressed in 2005. The critical ruling in that 2005 case – that the ICCPR is not self-executing – does not reflect the close textual analysis that the Supreme Court requires. As I observed in my concurrence to the panel opinion here, this case at its core is about "whether a substantial group of United States citizens should be given a right that our country and the international community agree is a fundamental element of a free society." 626 F.3d at 612. This is the paradigm of a question of "exceptional importance." The Commonwealth deserves to have that question addressed through a process that respects our standard for granting en banc review and respects the desire of the Commonwealth to be heard. By those measures, the denial of en banc review by three of our colleagues is a grievous error.

**THOMPSON, Circuit Judge, dissenting from the denial of rehearing en banc.** I see this case as presenting an issue of exceptional importance — the disenfranchisement of millions of United States citizens — and to this extent I join my colleagues' dissents from denial of rehearing en banc. See Fed. R. App. P. 35(a)(2). It is worth noting that the three of us fully agree on

at least this limited question;[36] indeed, I frankly cannot fathom how anyone could conclude that the denial of such a fundamental right to such a significant number of people is anything less than exceptionally important. Therefore, more briefly but no less vehemently than Judges Torruella and Lipez, I dissent.

By the Court:
/s/ Margaret Carter, Clerk

cc: Hon. Jay A. García-Gregory, Ms. Frances de Moran, Clerk, United States District Court for the District of Puerto Rico, Mr. Aldarondo-Lopez, Mr. Fleming, Mr. Singer, Mr. Wolfson, Mr. Waxman, Mr. Aldardondo-Ortiz, Mr. Igartúa, Mr. Aliff-Ortiz, Mr. Riess & Mr. Freeman.

---

[36]The three of us also agree with Judge Howard's conclusion (in dissent from an earlier Igartúa opinion) that we are not bound by the Senate's declaration of the ICCPR's non-self-executing status, particularly given that the Senate's declaration conflicts with the treaty's text. Igartúa III, 417 F.3d 145, 190 (Howard, J., dissenting). I do not read Judge Howard's concurrence here as changing his position. In the end this and other questions of the ICCPR's interpretation would be better and more definitively resolved after thorough arguments before the en banc court.